## ALBERT FRANCIS HIGNUT, JR. *v.* STATE OF MARYLAND

[No. 238, September Term, 1972.]

*Decided April 6, 1973.*

400

402

The cause was argued on November 30, 1972, before MORTON, GILBERT, MENCHINE and DAVIDSON, JJ., and reargued on March 8, 1973, before ORTH, C. J., and MORTON, THOMPSON, MOYLAN, POWERS, CARTER, GILBERT, MENCHINE, SCANLAN and DAVIDSON, JJ.

*William E. Seekford* for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edwin H. W. Harlan, Jr., State's Attorney for Harford County, John Edward Kelly* and *Victor J. D'Avella, Assistant State's Attorneys for Harford County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court. MENCHINE, GILBERT and DAVIDSON, JJ., dissent and MENCHINE, J., filed a dissenting opinion in which GILBERT and DAVIDSON, JJ., concur at page 422 *infra.*

Commendably, there is a high resolve in many police-men to ferret out the last shred of probable cause; regrettably, there is a concomitant inertia in those police-men toward putting it down on paper. That gap between the latent and the kinetic (with its Fourth Amendment consequences) echoes T. S. Eliot in *The Hollow Men,* "Between the idea and the reality, between the motion and the act, falls the Shadow." In the case at bar, the shadow fell between what the police worked up and what the police wrote down.

The appellant, Albert Francis Hignut, Jr., was con-victed in the Circuit Court for Harford County by Judge Albert P. Close, sitting without a jury, upon two sep-arate counts of an indictment charging violations of the Controlled Dangerous Substances Law.

Upon the first count, he was convicted of distributing marijuana. The *corpus delicti* thereof occurred at 6:40 p.m. on August 20, 1971. No Fourth Amendment issue is involved in its proof. Upon the third count, he was convicted of possession of marijuana. The *corpus delicti* thereof was established by a search executed at 11:30 p.m. on that same evening. The evidence that directly supported the conviction upon the first count was avail-able to support the issuance of the warrant critical to the third count. The most difficult question facing us will be that of how adequately the application for the warrant, within its four corners, reflected the available reality.

Since another of the contentions goes to the legal sufficiency of the evidence of distributing marijuana under the first count, an initial discussion thereof will provide the necessary backdrop for the contentions which follow.

### SUFFICIENCY OF EVIDENCE—DISTRIBUTION COUNT

On August 20, 1971, Mrs. Phyllis Ann Rorrer, a 23-year-old divorcee, lived with her two young children at 302 N. Main Street in Bel Air. The building was a two-

story apartment house, with two apartments upon the first floor, and two on the second. Mrs. Rorrer lived on the first floor. Since February, 1971, Laura Gunther had resided in apartment number 3, located on the second floor. The two neighbors became friendly with each other. Two regular habitues of the upstairs apartment were the appellant and another man known only to Mrs. Rorrer as "Ted". Mrs. Rorrer was aware that the occupants of the upstairs apartment used or dealt in drugs. She had on occasion told them that, as far as she was concerned, what they did was their own business, so long as they did not involve herself, her children, or her babysitter. At some time shortly before August 20, however, Mrs. Rorrer found out that her babysitter had gotten involved with drugs through the upstairs neighbors. She decided to notify the police. She picked August 20 because "Laura informed me that there was a party that night and I figured well, that would be the time to do it."

At some time between 4:30 and 5 p.m. on the afternoon of August 20, Mrs. Rorrer met with Sgt. Daniel Leftridge of the Bel Air Town Police. She informed him that there was going to be a "pot party" in Laura Gunther's apartment later that evening. Sgt. Leftridge persuaded Mrs. Rorrer to attempt to obtain some marijuana from the occupants of the upstairs apartment. Mrs. Rorrer was searched by a police clerk, Mrs. Patricia Duty, and was found free of any narcotics. The two women then left together and went immediately to 302 N. Main Street. Mrs. Duty remained downstairs in the hallway and watched Mrs. Rorrer ascend the stairs and knock on the apartment door of Laura Gunther. The flight of stairs consisted of approximately twelve steps.

Mrs. Rorrer was admitted to the apartment. Laura Gunther, the appellant, and "Ted" were all present. The appellant was sitting in front of a coffee table on which there was a scale and some aluminum foil. The appellant was cutting and weighing a dark brown vegetable substance. General conversation followed, in the course of

which the appellant and Laura Gunther acknowledged to Mrs. Rorrer that they had some "hash". Mrs. Rorrer was invited to the party that night. She declined, claiming that she had other plans. She did indicate, however, that she wouldn't mind taking some "hash" and trying it. She indicated that she wanted to be alone the first time she tried it. The appellant handed her a small package wrapped in aluminum foil. Mrs. Rorrer soon excused herself and left the apartment. As soon as she came through the door, she could see Mrs. Duty standing in the downstairs hall looking up at her. Both women immediately entered Mrs. Rorrer's downstairs apartment. Mrs. Duty noted the time and examined the package. They telephoned Sgt. Leftridge.

The clerk, Mrs. Duty, testified that before leaving the police station, she thoroughly patted down Mrs. Rorrer. Mrs. Rorrer was wearing a pair of slacks and a short-sleeved sweater. Mrs. Duty also thoroughly searched Mrs. Rorrer's pocketbook. Her testimony in all regards substantiated that of Mrs. Rorrer. She saw Mrs. Rorrer ascend the stairs, knock on the door of apartment 3, and then enter. She recorded the time as precisely 6:40 p.m. She remained in the hallway. She heard and saw Mrs. Rorrer exit the apartment at precisely 6:53 p.m. She immediately observed the brown substance contained in the small aluminum foil package. She proceeded with Mrs. Rorrer back to police headquarters. At no time was Mrs. Rorrer out of her sight except for the 13 minutes when Mrs. Rorrer was inside the apartment of Laura Gunther.

Sgt. Leftridge had been a policeman for approximately five years. He had attended a three-day seminar on the identification of narcotic drugs and had worked with the Maryland State Police on a number of cases involving narcotics. He had been involved in narcotic investigations for approximately three years. His testimony coincided with that of Mrs. Rorrer and that of Mrs. Duty. He testified further that immediately upon looking at the brownish-black substance turned over to him by the

two women, he recognized it as hashish. He stated that he was familiar with it both because of previous investigations and because of narcotics seminars. The trial court ruled that he was qualified to render an expert opinion as to the identity of the substance.

Deputy Sheriff Richard Michael Aiello had been working on narcotic investigations for three years. He was with Sgt. Leftridge when the suspected hashish was turned over. His conclusion paralleled that of Sgt. Leftridge. He testified that he performed a Duquonois Levine field test on the substance and that the results of the test were positive for marijuana. The testimony as to that field test was excluded from the trial upon the merits, however, because the Assistant State's Attorney did not qualify Deputy Aiello as an expert. A report from the Baltimore City Crime Laboratory confirmed that the suspected substance was hashish, a variety of marijuana.

The evidence showed directly facts from which the trial judge could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of distributing marijuana. We cannot say, therefore, that the trial judge was clearly erroneous in reaching a verdict of guilty upon the first count. *Williams v. State,* 5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331; Maryland Rule 1086.[1]

*PROBABLE CAUSE FOR THE SEARCH WARRANT*

With the single exception of the report from the Baltimore City Crime Laboratory, every bit of incriminating evidence hereinbefore recited as sufficient to sustain the conviction for distribution, was available to the police as they prepared the application for the search warrant. Moreover, the result of the Duquonois field test, which was ultimately excluded from the trial upon the merits, was also available on the issue of probable cause. Notwithstanding that wealth of evidence

---

1. Laura Gunther, in a separate trial, was permitted to enter a plea of guilty to the charge of simple possession.

with which to establish unimpeachable probable cause, the actual recitation of supporting data was so spare as to be almost cavalier:

"That on Friday, August 20, 1971 your affiants received information from a confidential informant that Hashish was present in the said apartment house.

It is further stated that the informant, after being searched by the affiants went to the said apartment house, then to the second floor of the said house, knocked on the door of apartment #3 and was permitted entrance to the said apartment #3. After entering said apartment, the informant had conversation with Laura Gunther, occupant of said apartment #3. It is further stated that the informant while in said apartment obtained a small block of compressed brown vegetable substance, wrapped in tinfoil, which your affiants tentatively identified as Hashish, a form of Marihuana. The informant exited from the said apartment house and brought the suspected Controlled Dangerous Substance directly to your affiant Patricia Ann Duty, who was standing in the hallway of 302 North Main St., Bel Air, Maryland. Your affiant, Patricia Ann Duty, with the Confidential Informant went directly to your affiant Sgt. Daniel V. Leftridge, who was waiting for them at the Bel Air Police Department, located at 39 Hickory Avenue, Bel Air, Maryland.

Your affiant Leftridge has been a Police Officer for approximately five years and has attended a Federal Narcotics Seminar on Narcotics and has worked with the Maryland State Police Vice Narcotics Unit in the investigation of Narcotics Cases."

It is axiomatic that in analyzing the probable cause for the issuance of a search warrant, we are confined

to the four corners of the affidavit itself. *Smith v. State,* 191 Md. 329, 335, 62 A. 2d 287; *Sessoms v. State,* 3 Md. App. 293, 296-297, 239 A. 2d 118; *Dawson v. State,* 11 Md. App. 694, 714-715, 276 A. 2d 680. The wealth of data available to the police here, but not included in the affidavit, is wasted for purposes of Fourth Amendment review.

Our exhortation to police departments to put down in warrant applications all the data which they reasonably can, does not mean that we find the present effort fatally deficient. It is thin, but it may pass muster. The cause for despair, we note in passing, is that it is so much thinner than it need have been.

Our admonitions and exhortations aside, we are animated in reaching our decision by the philosophy permeating the opinions of the Supreme Court on the spirit in which applications for warrants must be reviewed. As that Court said in *United States v. Ventresca,* 380 U. S. 102, at 108, 85 S. Ct. 741, at 746, 13 L.Ed.2d 684:

> "These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once enacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

In *Aguilar v. Texas*, 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723, the Supreme Court pointed out that the preference for warrants is so marked, that less persuasive evidence will justify the issuance of a warrant than would justify a warrantless search or warrantless arrest.* As the Court there said, at 378 U. S. 111:

> "Thus, when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' ibid., and will sustain the judicial determination so long as 'there was substantial basis for [the magistrate] to conclude that narcotics were probably present. * * *'."

This preference was reiterated in *Ventresca*, 380 U. S. at 109:

> "However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones v. United States, supra,* 362 U. S. [257], at 270, [80 S. Ct. 725, at 735, 4 L.Ed.2d 697, at 707, 78 A.L.R.2d 233]."

---

\* The definition of "probable cause" remains a constant, of course, applying alike to searches and to arrests, with warrants or without warrants. The "preference" is rather a rule of construction for the resolution of "doubtful or marginal cases".

See also *Henderson v. State,* 243 Md. 342, 221 A. 2d 76; *Tucker v. State,* 244 Md. 488, 224 A. 2d 111; *Scott v. State,* 4 Md. App. 482, 243 A. 2d 609; *Hall v. State,* 5 Md. App. 394, 247 A. 2d 548; *Johnson v. State,* 8 Md. App. 187, 259 A. 2d 97; *State v. Swales,* 12 Md. App. 69, 73-74, 277 A. 2d 449.

In that spirit, we approach the affidavit at bar. Initially, we note that the source of arguably important hearsay information is referred to guardedly as "a confidential informant". As far as may be deduced from the four corners of the application, he (we do not even know that the gender is female) is presumptively a typical police informant [1] "from the criminal milieu" and, therefore, needs to be subjected to a cautious and skeptical scrutiny under the rigorous standards of *Aguilar v. Texas,* 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969). The first prong of the *Aguilarian* two-pronged analysis requires that "the magistrate must be informed of some of the underlying circumstances . . . from which the officer concluded that the informant . . . was 'credible' or his information 'reliable'." Since no "underlying circumstances" whatsoever in this regard are furnished, the "confidential informant" at bar fails *Aguilar's* "credibility" test abjectly. [2]

---

1. See *Nutter v. State,* 8 Md. App. 635, at 637, n. 1, 262 A. 2d 80, for an excellent discussion of the classes of police informers and their character.

2. Ironically, the "credibility" hurdle could have been neatly finessed if the informant had been frankly identified, in the application, as "Mrs. Phyllis Rorrer" or if her status had been frankly described as "downstairs neighbor and acquaintance".

Confidentiality was not the motivating factor for the more cryptic reference, not simply because Mrs. Rorrer had made her disposition manifest if ever a member of her family circle were involved in the drug traffic, but because the recital as to what the "confidential informant" did was, *ipso facto,* a dead giveaway as to identity in any event. Mrs. Rorrer's role, from start to finish, was overt. She readily undertook, at Sgt. Leftridge's urging, "to beard the lion in his den" and to come out with some hashish. She testified boldly at the trial. She was *not* a "pipeline from the underworld" for ongoing investigative purposes. To have characterized her as a "confidential informant," with all the attendant

*Spinelli,* however, points out an alternate route to the establishment of "credibility". Even where the internal evidence about the informant himself, or about the circumstances under which the information was furnished, fails to establish intrinsically personal "credibility" or informational "reliability," external evidence, contained elsewhere in the application, may be examined to see what buttressing it provides. Independent police observation may tend to verify—to corroborate—the story as told by the informant. A direct showing that some of the story has been verified as true lends credence to the remaining unverified portions of the story. How much verification is needed depends upon how much bolstering the "credibility" requires. *Dawson v. State,* 14 Md. App. 18, 41-42, 284 A. 2d 861. *Spinelli* described the buttressing technique, at 393 U. S. 415:

> "If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must

---

Fourth Amendment problems, appears to have been the result of no more than a verbal convention or linguistic habit.

Such verbal conventions could at times be needlessly lethal to search warrants. It should be always remembered that the healthy skepticism and the intensive scrutiny of *Aguilar* and *Spinelli* are directed at the typical underworld "stoolie" drawn from the criminal milieu, and not at named, or even unnamed, victims of crime, witnesses to crime, neighbors, employees of banks or motels, etc., or members of other law enforcement agencies. *King v. State,* 16 Md. App. 546, 298 A. 2d 446; *Thompson v. State,* 16 Md. App. 560, 298 A. 2d 458; *Dawson v. State,* 14 Md. App. 18, 33-34, 284 A. 2d 861. And see the excellent discussion in *People v. Glaubman,* 485 P. 2d 711 (Colorado, 1971). Cf. *United States v. Ventresca,* 380 U. S. 102, 85 S. Ct. 741, 13 L.Ed.2d 684; *Rugendorf v. United States,* 376 U. S. 528, 84 S. Ct. 825, 11 L.Ed.2d 887; *Whiteley v. Warden,* 401 U. S. 560, 91 S. Ct. 1031, 28 L.Ed.2d 306. And see *United States v. Harris,* 403 U. S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723, at 403 U. S. 595-596, and at 600 (dissenting opinion by Harlan, J.). There is no premium on confidentiality except where confidentiality is really required.

An even more direct solution to the "credibility" problem at bar would have been to have had Mrs. Rorrer appear before the issuing magistrate herself and take the oath. As it is, we labor to do indirectly what could so simply have been done directly.

ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?"

We look now, under *Spinelli*, to the verifying observations made directly by Sgt. Leftridge and by Mrs. Duty, who were both affiants on the warrant application. Although the narrative language is again trimmed to the bone,[3] its clear import is that the affiants (or the appropriate one of them) searched the informant and found him "clean,"[4] and sent him into the suspect premises, whence he came out "dirty".[5] This is the typical "controlled buy"[6] investigative technique. So long as the controls are adequate, the "controlled buy" alone may well establish probable cause to search a suspect premises, let alone verify from scratch an informant's otherwise unestablished "credibility".

We look now to the adequacy of the controls. The application spelled out that 302 North Main Street was only a two-story apartment house. It spelled out that Mrs. Duty stationed herself "in the hallway of 302 North Main Street." Under the most unfavorable of readings—that Mrs. Duty was downstairs and in no position to see where the informant went, once he was upstairs—the

---

3. It would have been preferable to have made explicit what was here left as implicit. If the search revealed that the informant did not have any narcotics on his person, let the application say it in so many words. If the informant was under constant surveillance from the time of the search until his entering of the suspect premises, let the application say it in so many words. If the informant was under surveillance upon leaving the suspect premises and immediately turned over the contraband, let the application say it in so many words. That a model warrant is not a constitutional *sine qua non* does not mean that the model should not constantly be aspired to.

4. That is, "without narcotics".

5. That is, "with narcotics," as in the recent film classic, "Dirty Harry".

6. That the contraband "sample" was given away rather than sold is immaterial in establishing the probable whereabouts of the "mother lode". Nor is it cause to discard a phrase of such general utility and accepted usage as "a controlled buy".

field of possibilities is still reduced to no more than two, or at most three, apartments. This is a far cry from a surveillant's seeing, from the outside, an informant disappear into the bowels of a large, high-rise apartment house. The mathematical reduction in the number of possibilities is, *ipso facto,* the ratio of improved probability. Remembering that independent observation need only verify a significant part, and not the totality, of an informant's story, even this unfavorable reading might well pass constitutional muster.

It is unnecessary to rest the case for upholding the warrant at this more tenuous stage, however, for the constitution commands that reviewing courts eschew "a grudging or negative attitude" toward warrants lest they "discourage police officers from submitting their evidence to a judicial officer before acting." *Ventresca,* 380 U. S. at 108. We are admonished, in the interests of enhancing Fourth Amendment protections, to "accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant'." *Aguilar,* 378 U. S. at 111; *Jones v. United States,* 362 U. S. 257, 270, 80 S. Ct. 725, 4 L.Ed.2d 697, 708 (1960). We are encouraged not to be "hypertechnical". We are instructed that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants". *Ventresca,* 380 U. S. at 109. Under that mandate, the furthering of valuable liberties under the Fourth Amendment requires that we read possibly ambiguous language with an eye toward upholding the warrant rather than toward striking it down. A liberal respect for personal liberties permits us to do no less.

We, therefore, read the clauses, "went to the said apartment house, then to the second floor of the said house, knocked on the door of apartment #3, and was permitted entrance to the said apartment #3," to be a recital of the direct observations of the affiant Mrs.

Duty.[7] This is a reasonable interpretation, since more definite language that followed established clearly that Mrs. Duty went inside 302 North Main Street and was "standing in the hallway". The reasonable import of the application is, further, that Mrs. Duty and the informant went immediately to 302 North Main Street together, after the informant had been searched and found "clean". A fair reading of the application establishes, further, that, upon exiting apartment #3, the informant was observed by Mrs. Duty; the informant showed the contraband to Mrs. Duty; and the two of them went· "directly" back to police headquarters and the waiting Sgt. Leftridge.

Although it would have been desirable to have had the informant describe the "cutting operation" which she observed, the large amounts of hashish and complementary paraphernalia in the apartment, and the invitation to the "pot party" scheduled for that evening, the inference is still clear that contraband remained on the premises after the informant's departure. It would be unreasonable to conclude that a single "controlled buy" (or gift) exhausted the merchandise in stock. The probabilities run in the other direction.

It remains only to be seen that what was obtained in the "controlled buy" was probably contraband. In view of Sgt. Leftridge's at least quasi-expertise, the description of "a small block of compressed brown vegetable substance, wrapped in tinfoil, which your affiants tentatively identified as Hashish, a form of Marihuana," bears no other reasonable interpretation.[8]

---

7. Ambiguity could have been avoided if the same impersonal, declarative style with the same indeterminate subject had not been used to describe these observations as well as those contained in the succeeding two sentences, which clearly were those of the informant alone. The "Dragnet"-style of narration makes it difficult to ascertain the precise point in the recitation where one source drops off and another source plugs in. When the medium becomes too austere, the message languishes.

8. Notwithstanding its non-indispensability, it is still difficult to condone the omission of all reference to the Duquonois Levine field test by Deputy Aiello. Equally clinching in this regard could have been the informant's reference to the cutting operation, the

This verification of so much of the informant's story clearly lends credence to the few remaining unverified portions of it and establishes "credibility" under *Spinelli*. Significantly, however, all that the informant actually added to the direct police observations was "that Hashish was present in the said apartment house" and that, after entering apartment #3, the informant "had conversation with Laura Gunther". The informant's story, once "credibility" is established, becomes little more than surplusage. If the informant had been nothing more than a robot or a trained ape, the directly observed "controlled buy"—with the informant as a mere mechanical agent—would have been sufficient to establish probable cause.

Upon our constitutionally mandated, independent review, *Walker v. State,* 12 Md. App. 684, 691-695, 280 A. 2d 260, we find that the search was carried out pursuant to a validly issued warrant.

### SUFFICIENCY OF EVIDENCE—POSSESSION COUNT

Seized in the course of the search and admitted into evidence were a four-inch brass pipe, containing residue of marijuana, from beneath the seat cushion of the chair in which the appellant was sitting; tinfoil from a kitchen cabinet; a Gillette razor blade; and a triple beam balance scale, recovered from the living room closet, the pan of which scale contained residue of marijuana. The appellant seeks to dissociate himself from all connection with items found in an apartment not his own and not shown, at the moment of the search, to have been used by him. He claims the absence of any nexus whatsoever between himself and the items seized. He conveniently forgets the testimony of Mrs. Rorrer. Her observations earlier that day, placing him at a table in the middle of

conversation about "hash", the clear designation of the gift of the "hash" and its stated purpose, and the invitation to the "pot party". It is frustrating to see an application "scrape by" when it should have been overwhelming.

the living room, scraping off hashish with a razor blade, measuring it upon the scale, and wrapping it in tin or aluminum foil, and discussing both "hash" generally and the "pot party" scheduled for that evening, provide a nexus extraordinary. The evidence of possession was clearly sufficient.

## THE WARRANT WAS NOT A GENERAL WARRANT

The appellant seizes upon the following description in the warrant of the place to be searched:

> ". . . a two story apartment house, with brownish red asbestos shingles on the front, on both sides and the back, located on the West side of North Main Street, first house on the left going through the intersection of North Main Street and Broadway. The said dwelling is further described as having a full front porch which faces East towards North Main Street. Said Porch is brownish in color. It is further described as having a V shaped slate roof.
>
> That they are also being violated on the person of Laura Gunther, occupant of said apartment house."

He claims that this represents a "general warrant" in violation of the Fourth and Fourteenth Amendments, as well as Article 26 of the Maryland Declaration of Rights.

He complains 1) that a policeman from some other part of the state, not familiar with Bel Air, might have difficulty finding the house to be searched and 2) that the warrant does not adequately zero in upon the apartment of Laura Gunther. He claims that this makes the warrant into a "general warrant", to be constitutionally condemned.

We caution against a marked tendency of late toward a loose employment of the notion "general warrant". In *Harris and Schmitt v. State*, 17 Md. App. 484, 302 A. 2d 655, Judge Scanlan traces perceptively the history of the "general warrant" and its colonial counterpart, the "writ of assistance". These parallel instruments of governmental oppression aroused great furor on both sides of the Atlantic throughout the 1760's and 1770's. They were a contributing spark to the American Revolution. They were vivid in the apprehensive recollection of the constitution makers of the 1770's and 1780's, state and federal, who established protections to guard specifically against them. A decent respect for history and a careful use of language compels us to remember that the notion of a "general warrant" did not contemplate every minor imprecision in draftsmanship giving rise to some arguable ambiguity or fleeting confusion. The "general warrant" was a roving commission to police agents, in seeking out certain types of crime, to search anyone or any place, at any time, anywhere. The niggling complaint at bar is antipodal to the broad issue over which we fought a Revolution. Magna Charta need not be invoked everytime a policeman dots the wrong "i".

Considering the claim even at the more pedestrian level of adequate particularization, we still cannot hold for the appellant. In *Frey v. State*, 3 Md. App. 38, 46-47, 237 A. 2d 774, we made it clear that where a supporting affidavit is made a part of a warrant and incorporated by reference therein, that affidavit may be looked to to help supply necessary particularization. The incorporation of the application and affidavit into the search and seizure warrant at bar could not have been more clearcut:

> "The grounds for search and the basis for probable cause are as set forth in the attached Application and Affidavit for the issuance of a Search & Seizure warrant, which grounds are

as fully specified in the said application and affidavits which are attached hereto and made a part of this Search Warrant."

The application and affidavit, thus incorporated, abets the earlier description of the house to be searched by designating it specifically as 302 North Main Street in Bel Air. It, further, removes all doubt that the apartment to be searched is apartment #3, occupied by Laura Gunther, located on the second floor of the said apartment house. We see no problem whatsoever in terms of non-particularization of the place to be searched.

## THE INTRODUCTION OF THE SEARCH WARRANT

The appellant complains that the State did not timely introduce the original of the search warrant and, therefore, had no proper predicate for introducing the fruits of the search. The appellant cannot prevail for several reasons. The appellant properly moved to suppress all fruits of the search. The trial judge heard testimony and argument and withheld his decision until the close of the State's case. Both the State and the defense argued extensively on the contents of the warrant and its supporting affidavit. It is clear that both the defense and the court had copies of both documents before them. In *Kates v. State*, 13 Md. App. 688, 284 A. 2d 651, we held that where the court had the application for a search warrant and warrant itself before it, when ruling on the objection to the seized evidence, and the parties treated the documents as if they were properly before the court for its consideration, there was no fatal error in the State's failure to include the search warrant and application as a formal exhibit in the case. The defense, moreover, in the case at bar, formally introduced its photostated copy of both documents into evidence. There is absolutely no suggestion that the photostated copy did not accurately reflect the original document. Furthermore, the court, in the act of ruling

upon the motion to suppress, permitted the State to offer the search warrant, notwithstanding the fact that the State had moments earlier closed its case. A presiding judge in a criminal case may at any time, prior to verdict, permit either the State or the defense to reopen the case for the purpose of offering additional evidence where "the ends of justice might be subserved" and where "there is no showing that his action was arbitrary or that his discretion was abused." *Burnett v. State,* 11 Md. App. 550, 275 A. 2d 176; *Boone v. State,* 2 Md. App. 80, 233 A. 2d 476. Even if the technical reopening of the State's case to permit the formal introduction of the original document had been necessary, we can conceive of no indiscretion on the part of the trial court in permitting it.

## THE CROSS-EXAMINATION OF DEPUTY AIELLO AND MRS. DUTY

The appellant now argues that he was erroneously cut off in his cross-examination of Mrs. Duty and of Deputy Aiello in pursuit of a theory which he never articulated to the trial court and which, apparently, he never fully developed until the appellate stage. He now suggests that Mrs. Duty may not have been a true affiant on the warrant application. He deduces this possibility from the fact that she had to leave the police headquarters at some time between 7 and 8 p.m. to mollify an irate husband stuck at home. The drafting of the warrant application was left to Sgt. Leftridge and Deputy Aiello. No suggestion was made at the trial that Mrs. Duty did not return briefly to take the oath and sign the affidavit in the presence of the issuing District Court judge. Her signature plainly appears upon the application and her presence is plainly attested to by the issuing judge.

A single question was involved in the cross-examination of Mrs. Duty. She was asked whether she had remained home, after arriving there. She answered that she had not. She was asked when she left again. She

replied, "I don't know. I'd. . . ." At that point, the State objected that the cross-examination had extended well beyond the scope of direct examination. The court sustained the objection. The appellant did not advance his imaginative theory at that time nor did he ever call Mrs. Duty as his own witness to ask her point-blank whether she had ever signed the affidavit.

When the appellant attempted to cross-examine Deputy Aiello about the preparation of the warrant, an objection was raised. The appellant acknowledged at that time that his purpose was "to verify any allegations that were in it or discredit them." The court properly ruled that, "If the testimony was directed to going beyond the affidavit, back behind the affidavit, then the court is going to sustain the objection." Deputy Aiello was never asked by the appellant whether he knew whether Mrs. Duty had signed the affidavit or not. It is clear to us that the trial court was never given an opportunity to rule upon the propriety of any cross-examination in the light of the appellant's present theory. The point is, therefore, not properly preserved for review. Maryland Rule 1085.

## THE CHAIN OF CUSTODY

The appellant challenges the chain of custody of the marijuana which formed the basis for his conviction for distributing, under the first count. His protestations notwithstanding, the integrity of the evidence is clear. Immediately upon leaving apartment #3, Mrs. Rorrer exhibited the marijuana which had been distributed to her to Mrs. Duty. The two of them took it immediately to Sgt. Leftridge. Deputy Aiello was present with Sgt. Leftridge, conducted the preliminary field test, and took custody of the evidence. The record clearly shows that it was placed by Deputy Aiello in an envelope and that the envelope was sealed and the seal stapled. The envelope was initialled by Deputy Aiello, Sgt. Leftridge, and Mrs. Duty.

Deputy Aiello could not recall with certainty whether he placed the envelope immediately in a police locker or whether he carried it in his pocket until after the 11:30 p.m. search had been executed. At one time or the other, however, he did place it under lock and key in the narcotics locker at police headquarters. On August 24, 1971, he delivered it for analysis to the Baltimore City Police Department Crime Laboratory. The seal was still intact when he turned it over to the chemist.

The receiving chemist placed his initials on the envelope and assigned an identification number for the forthcoming analysis. At a later date, Deputy Aiello picked up the package from the Crime Laboratory. It had a new, unbroken seal bearing the legend, "Warning —police seal". That seal remained intact until Deputy Aiello, in the course of giving his testimony, broke the seal. The laboratory report bore a number identical with that entered on the exhibit.

The legal test to be applied to determine whether a proper chain of custody of physical evidence is established, is whether it is reasonably probable that no tampering occurred. *Blake v. State*, 15 Md. App. 674, 683, 292 A. 2d 780, 784. The circumstances described above would permit the trier of facts to conclude that no tampering had occurred.

## ENTRAPMENT

There is no shred of support for the appellant's theory of entrapment. Mrs. Rorrer testified that her hosts in apartment #3 invited her to a "pot party" to enjoy some hashish later that evening. In declining, she indicated that she would not mind trying some on her own. At that point, the appellant freely offered her some. Chief Judge Orth made it very clear in *Simmons v. State*, 8 Md. App. 355, 259 A. 2d 814, that the burden of proving an inducement to commit the offense is upon the defendant. That burden is well-nigh impossible to sustain where, as here, the appellant chose not to testify and

where the only defense witness, Laura Gunther, was deliberately restrained from offering any testimony pertaining to the visit of Mrs. Rorrer to her apartment. We are singularly unenlightened as to the state of the appellant's mind as he distributed marijuana to Mrs. Rorrer. Under the circumstances, we cannot say that the trial judge was clearly wrong in not being persuaded that entrapment barred conviction.

*Judgments affirmed.*

*Menchine, J., dissenting:*

It is crystal clear that the substantive evidence at trial was legally sufficient to convict under the first count of the indictment. I support fully, as well, the views expressed by the majority: (a) that the warrant itself was in proper form; (b) that it properly was before the court below; (c) that the rulings of the trial judge in cross-examination of State's witnesses were not erroneous; (d) that the chain of custody of evidence was established; and (e) that there was no evidence of entrapment in the case. It is equally clear to me, however, that the search and seizure warrant was improvidently issued by the judge of the District Court.

The opinion of the majority declares:

"It is axiomatic that in analyzing the probable cause for the issuance of a search warrant, we are confined to the four corners of the affidavit itself." [Maj. Op. 6]

and that

"less persuasive evidence will justify the issuance of a warrant than would justify a warrantless search or warrantless arrest." [Maj. Op. 7]

The affidavit in the subject case quite properly is to be viewed in the light of those clear, correct and reasonable rules of law. Nonetheless it must contain such

allegations of fact or inferences reasonably deducible therefrom as would establish "probable cause" for the issuance of the warrant. This demand, originating in the Fourth Amendment prohibition against unreasonable searches and seizures, means that: "A judge may issue a search warrant when * * * there is probable cause to believe that a crime is being committed * * * in a building * * * and that evidence of the crime is * * * within the place to be searched. * * * Probable cause is less than certainty or demonstration but more than suspicion or possibility. It is to be determined by the judge to whom application for the warrant is made. If a prudent and cautious man would be justified from the facts presented in the affidavit in believing that the offense has been or is being committed, the warrant properly may be issued." [1] The majority contends that the data contained within the subject affidavit furnished that "probable cause." Dissenting strongly from that conclusion, it appears appropriate to declare the basis for the contrary view.

For better understanding, the language of the affidavit is repeated:

> "That on Friday, August 20, 1971 your affiants received information from a confidential informant that Hashish was present in the said apartment house.
>
> It is further stated that the informant, after being searched by the affiants went to the said apartment house, then to the second floor of the said house, knocked on the door of apartment #3 and was permitted entrance to the said apartment #3. After entering said apartment, the informant had conversation with Laura Gunther, occupant of said apartment #3. It is further stated that the informant while in said apartment obtained a small block of compressed brown vegetable substance, wrapped in tinfoil,

1. *Buckner v. State*, 11 Md. App. 55, 61.

which your affiants tentatively identified as Hashish, a form of Marihuana. The informant exited from the said apartment house and brought the suspected Controlled Dangerous Substance directly to your affiant Patricia Ann Duty, who was standing in the hallway of 302 North Main St., Bel Air, Maryland. Your affiant, Patricia Ann Duty, with the Confidential Informant went directly to your affiant Sgt. Daniel V. Leftridge, who was waiting for them at the Bel Air Police Department, located at 39 Hickory Avenue, Bel Air, Maryland."

In making its preliminary assessment of that affidavit the majority opinion stated that "the actual recitation of supporting data was so spare as to be almost cavalier" [Maj. Op. 5], yet finally concluded that "Upon our constitutionally mandated, independent review, * * * we find that the search was carried out pursuant to a validly issued warrant." [Maj. Op. 14]

The labored effort [2] of the majority to find probable cause for issuance of the warrant in the pages intervening between those two statements is not persuasive.

The majority acknowledges that the 'confidential informant' at bar "fails 'Aguilar's credibility' test abjectly" [Maj. Op. 8], but suggests that "Independent police observation may tend to verify—to corroborate—the story as told by the informant." [Maj. Op. 9]

The majority's assessment of those police observations begins with the unwarranted assumption "302 North Main Street was only a two-story apartment house." The affidavit does not say so.

The majority then comments: "Under the most unfavorable of readings—* * * Mrs. Duty was downstairs and in no position to see where the informant went." We

2. Footnotes 2, 3, 4, 7 and 8 of the majority opinion are almost plaintive in their description of what the affidavit "might have said." It is suggested that they demonstrate that the majority decision on the warrant subconsciously is based upon the substantive evidence produced at trial.

suggest this is not "the most unfavorable" reading. It is the *only* permissible reading from the four corners of the affidavit. Thus, there is neither fact nor inference to show that the informant entered "the place proposed to be searched" without contraband and emerged therefrom with contraband.

Brushing this circumstance aside, the majority then suggest that "the field of possibilities is still reduced to no more than two, or at most three, apartments," adding that "The mathematical reduction in the number of possibilities is, *ipso facto*, the ratio of improved probability." Implicit in that suggestion is a willingness by the majorty to accept the affidavit as furnishing probable cause for the search of *any* of their assumed two or three apartments.

The affidavit proceeded to recite: "Your affiants received information * * * that Hashish was present in the said apartment house * * * informant while in said apartment obtained a small block of compressed brown vegetable substance wrapped in tinfoil which your affiants tentatively identified as Hashish."

There is a double deficit inherent in that data: (a) whether any contraband remained in the apartment after the informant's departure, and (b) whether the substance was contraband at all. The word "tentative" is both conclusory and provisional. No facts are recited in the affidavit that would permit "a neutral and detached magistrate" [3] to make a reasoned resolution of the doubts arising from the wording of that part of the affidavit.

In my opinion, an affidavit should be a container of knowledge upon which an impartial magistrate can base his decision as to whether *vel non* probable cause exists for the issuance of a warrant. In the instant case the "container" was more of a sieve through which probable cause was allowed to leak out before the matter was presented to the District Court judge.

---

3. *Aguilar v. U. S.*, 378 U. S. 108.

I am persuaded that the language used in *Spinelli v. U. S.*, 393 U. S. 410, 419, has specific application in this case:

> "We cannot sustain this warrant without diluting important safeguards that assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry."

The first paragraph quotation from T. S. Eliot in the majority opinion: "Between the idea and the reality, between the motion and the act, falls the Shadow," furnished an interesting prelude to that opinion's fabrication of substance from shadow. *Eliot's Works* would have provided a fitting epilogue to a wholly different opinion if the affiants had chosen to follow the course of an Eliot character in "Sweeney Agonistes": "I gotta use words when I talk to you."

I am persuaded the affidavit did not show probable cause.

I am authorized to state that Judge Gilbert and Judge Davidson concur in this opinion.