# JOHN ELMER GIPE, JR. *v.* STATE OF MARYLAND

[No. 1754, September Term, 1982.]

*Decided October 5, 1983.*

The cause was argued before WEANT, BISHOP and ALPERT, JJ.

*Gary W. Christopher, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Stephanie J. Lane, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, M. Kenneth Long, Jr., State's Attorney for Washington County,* and *Laura Leizear, Assistant State's Attorney for Washington County,* on the brief, for appellee.

ALPERT, J., delivered the opinion of the Court.

John Elmer Gipe, Jr., the appellant, having been convicted of possession of a controlled dangerous substance (marijuana), possession with intent to distribute marijuana, possession of a non-controlled dangerous substance intended by him for use or distribution as a controlled dangerous substance, and maintaining a common nuisance, was sen-

tenced to 3 consecutive five-year sentences.[1] On appeal, he complains:

I. The court below erred in denying the motion to suppress.

II. The State introduced insufficient evidence to prove that Appellant possessed a noncontrolled substance with the intent to distribute it as a controlled substance.

III. The evidence adduced at trial was legally insufficient to sustain a conviction for maintaining a common nuisance.

IV. The evidence adduced was legally insufficient to sustain Appellant's conviction of possession with intent to distribute marijuana.

As we perceive no reversible error, we shall affirm.

## FACTUAL BACKGROUND

On January 15, 1982, local police executed a search and seizure warrant at the appellant's home, 32 East Washington Street, 2nd Floor Rear, Hagerstown, Maryland. It appeared that a party was in progress at the time, as a keg of beer was found on the back porch and a stereo was being played. David Gipe, brother of the appellant, and one Robert Heimrich were observed pushing a tray underneath a couch upon which they were seated in the living room. It was later determined that on the tray were two bags of marijuana and three other bags containing 50-to-100 caffeine tablets. When Officer Nelson Sheppard, Jr., an affiant on the search warrant application and one of the officers executing the warrant, entered, the appellant was observed standing in the doorway leading from a hallway into a bathroom. His girlfriend and co-defendant below, Michele Reed, who along with appellant were the sole tenants of the subject premises, was observed seated in front of a stereo cabinet. Another person, a Mr. Harvey, was found in the kitchen.

---

1. The possession of marijuana charge was merged by the trial court into the charge of possession with intent to distribute marijuana.

Property taken pursuant to the warrant included:

Two clear plastic bags containing marijuana, weighing a total of 23.80 grams;

Two clear plastic bags each containing marijuana, weighing a total of 18.30 grams;

One clear plastic bag containing 63 oblong white single-scored "20" tablets with red and blue specks (caffeine tablets);

Six blue single-scored "10" tablets (methapyrilene), a non-controlled dangerous substance;

One clear plastic bag containing 20 oblong white single-scored "20" tablets with red and blue specks (caffeine tablets);

One clear plastic bag containing 97 pink heart-shaped tablets (caffeine tablets);

One clear plastic bag containing 96 white single-scored "20" tablets with red and blue specks (caffeine tablets);

One clear plastic bag containing 108 pink heart-shaped tablets (caffeine tablets);

One clear plastic bag containing 101 oblong single-scored "20" tablets with red and blue specks (caffeine tablets);

One clear plastic bag containing 98 pink heart-shaped tablets (caffeine tablets);

One clear plastic bag containing 8 off-white single-scored "714" tablets (Tylenol);

Five oblong single-scored white tablets with green specks (caffeine tablets);

Eight packs of cigarette papers;

A stimulants catalog and sales receipt;

A wood container with a cigarette holder;

A "power hitter";

Two pipes;

A set of scales;
Five documents referrable to the tenants John Gipe
and Michele Reed;
One syringe; and
Eleven pieces of pipes.

When the appellant was searched, he was found to be in possession of a cigarette holder, a chrome pipe with a wooden bowl, and a note listing people's names with monetary figures ranging from $3.00 to $26.00 beside each name. On May 17, 1982, he was indicted and charged. A jury trial was held on August 16, 1982 and appellant was found guilty as charged on all four counts. This appeal followed.

## I.

Appellant contends that "the court is asked to take the word of 'the biggest liar in town'[2] that appellant was selling marijuana and non-controlled substances while representing them to be controlled dangerous substances," and therefore "the warrant fails under *Aguilar, Spinelli,* and fails again under *Gates.*" Appellant correctly observes that the trial court found probable cause to exist from the search warrant affidavit in that a "controlled buy" was conducted. *See, Hignut v. State,* 17 Md. App. 399, 412-15 (1973). However, he argues that "the affiant's observations in this case confirmed nothing more than that someone in appellant's house had for an unknown amount of money sold an unknown amount of an unknown legal substance." Thus he contends that notwithstanding the controlled purchase, the informant's credibility is highly germane for there is no probable cause without fully crediting the informant's claim "that they were supposed to be 'Ludes." It appears that appellant not only has misconstrued the factual allegations of the affidavit but also the import and meaning of the Supreme Court's recent monumental decision in *Illinois v. Gates,* U.S. , 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983),

---

2. This characterization of the informant who participated in the controlled buy is based upon appellant's counsel's misconceived interpreta-

wherein the former Aguilar-Spinelli [3] analysis was abandoned in favor of a "totality of the circumstances" test.

The affidavit under attack was signed by Officers Nelson M. Sheppard, Jr. and Craig R. Bakner of the Hagerstown Police Department and provided in pertinent part:

> A second meeting was arranged with [Confidential Number Informant] 245 by your affiants during the second week of January 1982. It was learned from CNI 245 the door to the apartment on the 2nd floor of 32 E. Washington St. could be observed from the rear of the building through a glass enclosed rear porch. CNI 245 stated that he/she would be willing to make a controlled buy from the location. CNI 245 was then searched and found to be free of narcotics, narcotic paraphernalia, and any U.S. Currency. CNI 245 was then transported to the area of 32 E. Washington St. where he/she was then supplied with an amount of money from the Hagerstown Police Department Funds. The informant then left the control of your affiants and went directly to the 2nd floor of 32 E. Washington St. in the rear without having contact with any other subjects. He/she was then observed by your affiants knocking on the door to the 2nd floor rear west side apartment, the informant was allowed inside where he/she stayed approximately 10 minutes. CNI 245 was then observed exiting the residence and walked directly to your affiants without having contact with any other person. CNI 245 then turned over to your affiants a glassine baggie containing a quantity of off white round tablets. CNI 245 then stated that they were sold to him/her by John Gipe and that they were supposed to be "LUDES". Your affiants recognized the term "LUDES" to be street

tion of certain remarks made by the motions judge during the hearing on appellant's motion to suppress.

**3.** Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964).

jargon for Quaaludes. The informant was then searched and found to be free of all monies and drugs.

Your affiants, through their experience and expertise, recognized the "LUDES" that were sold to the informant were actually counterfeit substances that were being sold and represented as a Methaqualone; a field test in fact did prove they were not a true Methaqualone, but were a mixture of various substances.

Assuming, *arguendo,* insufficient information in the affidavit to establish the informant's veracity,[4] a common-sense practical approach under the totality of the circumstances would indicate a "controlled buy" of a non-controlled substance. As we stated in *Hignut,* "[i]f the informant had been nothing more than a robot or a trained ape, the directly observed 'controlled buy' — with the informant as a mere mechanical agent — would have been sufficient to establish probable cause." 17 Md. App. at 415. There ought to be no distinction, logically or empirically, between a "controlled buy" of a controlled dangerous substance and a non-controlled substance. At this point it should be noted that the affiants through their experience and expertise recognized the "LUDES" as being counterfeit substances that were being sold and represented as Methaqualone (a controlled dangerous substance). Given the fact that the informant told the affiants that "he/she" knew a subject by the name of John Gipe who was selling pills and "reef" (marijuana) and given the fact that "he/she" did indeed, according to the affidavit, make a controlled buy of what were represented to be "LUDES," probable cause existed, if not under the legal analysis of *Hignut,* then under the

---

4. According to the affidavit:

CNI 245 has executed 2 controlled buys of CDS for your affiants, that resulted in the issuance of a search and seizure warrant and the arrest of one person for the violations of the CDS laws. The other search and seizure warrant has not been served as of this writing.

*See* Barber v. State, 43 Md. App. 613, 616 (1979).

totality of the circumstances as recently explicated by the Supreme Court in *Gates*:

> This totality of the circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific "tests" be satisfied by every informant's tip. Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a *'practical, nontechnical conception.'*
>
> ... In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.
>
> * * *
>
> As these comments illustrate, probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. U.S. at , 103 S.Ct. at 2328-29, 76 L.Ed.2d at 543-44 (citations and footnotes omitted) (emphasis supplied).

In discussing the drafting of affidavits, Justice Rehnquist, delivering the majority opinion, went on to state:

> We also have recognized that affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area.' Likewise, search and arrest warrants long have been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of 'probable cause.' The rigorous inquiry into the *Spinelli* prongs

and the complex superstructure of evidentiary and analytical rules that some have seen implicit in our *Spinelli* decision, cannot be reconciled with the fact that many warrants are — quite properly, *ibid.* — issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings. Likewise, given the informal, often hurried context in which it must be applied, the 'built-in subtleties' of the 'two-pronged test' are particularly unlikely to assist magistrates in determining probable cause.     U.S. at    , 103 S.Ct. at 2330-31, 76 L.Ed.2d at 546 (citations omitted).

In an attempt to render guidance to reviewing courts, Justice Rehnquist further advised:

Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's *'determination of probable cause should be paid great deference by reviewing courts.'*

* * *

If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the warrant clause that might develop at the time of the search. In addition, the possession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring 'the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.' ... Reflecting this preference for the warrant process, the traditional

standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. ... We think reaffirmation of this standard better serves the purpose of encouraging recourse to the warrant procedure and is more consistent with our traditional deference to the probable cause determinations of magistrates than is the 'two-pronged test.'      U.S. at     , 103 S.Ct. at 2331, 76 L.Ed.2d at 546-47 (citations omitted) (emphasis supplied).

Appellant, forgetting that *Gates* instructs us to read affidavits in a practical, non-technical fashion, asks us to find a lack of probable cause where the affidavit has described the clandestine purchase of a quantity of tablets misrepresented by the seller to be a controlled dangerous substance, an act which, if proven, would be in violation of Art. 27, Section 286B of the Maryland Code. The trial court below did not err in denying the motion to suppress.

## II.

By the third count of the indictment Gipe was accused of possessing a non-controlled substance with intent to distribute it as a controlled substance in violation of Art. 27, § 286B(c) which provides:

It is unlawful for a person to distribute, attempt to distribute, or possess with intent to distribute, any noncontrolled substance intended by that person for use or distribution as a controlled dangerous substance or under circumstances where one reasonably should know that the noncontrolled substance will be used or distributed for use as a controlled dangerous substance.

a.

He argues that this section requires proof of "two discrete specific intentions: (1) to distribute the substance and (2) that ultimately distribution will be accompanied with at least implicit misrepresentation that the substance is illegal."

Appellant further contends "that even assuming proof of his possession of caffeine tablets with intent to distribute them, there was not sufficient further proof to negate the *presumption*[5] that he would distribute them legally as caffeine pills." We disagree with this contention and hold that there was sufficient evidence, both direct and circumstantial, whereby a rational trier of fact could have found the requisite intent and other elements of the crime beyond a reasonable doubt. *See, Jackson v. Virginia,* 443 U.S. 307 (1979).

Officer Sheppard had training in the identification of "methaqualudes" (a controlled dangerous substance) and knew how they were ordinarily packaged. Significantly, he testified that the tablets seized were packaged "in the customary manner for the way they are sold on the street in packages ranging from 50 tablets up to 100 tablets per bag." Further, he indicated that the tablets were caffeine tablets, and were similar in appearance to "street" amphetamines (the type manufactured in clandestine labs). He went on to describe the ordinary packaging of caffeine tablets and indicated that they were never dispensed in cellophane bags such as discovered on the premises. Finally, when asked: "When caffeine tablets are packaged like that, what are they sold to individuals as? he replied: "As amphetamines [a controlled dangerous substance] . . . ." Certainly, a rational trier of fact could have reasonably inferred the "two discrete specific intentions" identified by appellant.

---

5. The presumption referred to in appellant's argument is the *presumption* of innocence. Morissette v. United States, 342 U.S. 246, 274-75 (1952) and the "*presumption* that the law has been obeyed". Mirabile v. State Roads Commission, 247 Md. 492, 498 (1967) (emphasis supplied). We agree that the State continued to shoulder the burden to prove, beyond a reasonable doubt, that the appellant intended to misrepresent that the substance was a controlled dangerous substance.

b.

Furthermore, the officer's testimony included evidence of two considerations set out in § 286B for determining whether non-controlled dangerous substances are being distributed as controlled dangerous substances. Subsection (d) of that section provides:

(d) For the purpose of determining whether this section has been violated, the court or other authority shall include in its consideration the following:

(1) Whether the noncontrolled substance was packaged in a manner normally used for the illegal distribution of controlled substances;

(2) Whether the distribution or attempted distribution included an exchange of or demand for money or other property as consideration, and whether the amount of the consideration was substantially greater than the reasonable value of the noncontrolled substance;

(3) Whether the physical appearance of the noncontrolled substance is substantially identical to that of a controlled dangerous substance.

Sheppard's testimony revealed that the caffeine pills were paskaged in a manner usually used for illegal distribution, and that the tablets' physical appearance was similar to amphetamines, a controlled dangerous substance. While the seizure of the caffeine pills did not result from an exchange of money or other consideration, the quantity and packaging of the pills could give rise to the logical inference that these pills were to be sold.

c.

Additionally, appellant, relying on *Garrison v. State,* 272 Md. 123, 142 (1974), contends that the evidence was legally insufficient to prove possession. It is axiomatic that possession and control need not be immediate and direct but

may be constructive. *Henson v. State*, 236 Md. 518, 525 (1964). By his own admission, appellant and his girlfriend were the sole residents of the subject premises. Controlled dangerous substances were found in various parts of the premises. The instance of constructive possession has been considered by this Court on numerous occasions in cases similar in face to the instant case. *See, e.g., Nutt v. State,* 16 Md. App. 695 (1973). For a survey of other states' treatment of constructive possession of narcotics, *see* Annot., 92 A.L.R.3d 47, 70-71 (1979). Clearly there was sufficient evidence here of constructive possession.

### III.

By the fourth count of the indictment, the State alleged, in pertinent part, that:

> John Elmer Gipe, Jr. . . . unlawfully did keep a certain common nuisance, to-wit, an apartment . . . which was then and there resorted to by drug abusers *for the purpose of the illegal. . . distribution* . . . of controlled dangerous substances, to-wit, marijuana. (emphasis supplied.)

To "distribute" according to Article 27, Section 277(1) means to deliver other than by dispensing a controlled dangerous substance. "Delivery" means the actual, constructive or attempted transfer, exchange, or delivery of a controlled dangerous substance from one person to another with or without remuneration, whether or not there exists an agency relationship. Art. 27, Sec. 277 (i).

The appellant argues that a chargeable offense must be of an ongoing nature in its ordinary usage and since the evidence suggested merely an isolated violation, the conviction must be reversed.

We certainly have no quarrel with the principle that a conviction for "nuisance" requires proof of a recurrent offense. Aside from the permissible inferences of recurrence which could rationally be drawn from the State's

case-in-chief [6] and particularly the testimony of Officer Sheppard (discussed in II *supra*), appellant has apparently forgotten his own testimony. In addition to admitting to smoking marijuana quite often at his home, he clearly confessed that "[t]hey brought marijuana there for the parties we've had there to smoke." He indicated that although he did not keep marijuana on the premises, people brought it there and gave it to him. His testimony was corroborated by Michele Reed.

Thus, appellant had at trial admitted to the use of his premises as a place where marijuana users would bring marijuana for the purpose of "delivery" to him so that he might smoke the same. By his own testimony, he has established the ongoing nature of the offense.

## IV.

Because of the small quantity (42.3 grams) of marijuana found on the premises, Appellant contends that the evidence was insufficient to support the conviction for possession of marijuana with intent to distribute. Appellant correctly recognizes the statutory inference of specific intent to distribute which may be drawn from possession in sufficient quantity to *reasonably* indicate under *all* circumstances such an intent. *See,* Art. 27, Sec. 286 (a) (1); *Waller v. State,* 13 Md. App. 615 (1971). He astutely observes that inferences are permissible only if they are reasonable. It has been observed that:

> The courts have not articulated any specific quantity as the amount that gives rise to the finding of intent to distribute, nor have they indicated at what point one crosses the threshold

---

**6.** Assuming arguendo that the State's case-in-chief did not present sufficient evidence, by presenting a defense after denial of his motion for judgment of acquittal, appellant is deemed to have withdrawn his motion and thus has failed to preserve its denial for appellate review. Maryland Rule 756a. Winkles v. State, 40 Md. App. 616, 617 n.1 (1978); Barnes v. State, 31 Md. App. 25 (1976).

> between a quantity that does give rise to the reasonable inference of intent, and the quantity that does not give rise to that inference. The courts have declined to specify or suggest minimal quantity that would permit the inference of intent to distribute for the reason that once they do so, the wary dealer or possessor will take care to avoid having in his or her possession any quantity over and above the specified minimum. A specified minimum would be in effect a license to process the minimum or less.

R. Gilbert and C. Moylan, *Maryland Criminal Law* § 16.2 (1983).

The trial judge properly submitted the issue to the jury as triers of the fact who, after being properly instructed, obviously believed that Gipe intended to sell or otherwise "distribute" the packaged marijuana. The evidence was sufficient to sustain appellant's conviction. *Jackson v. Virginia, supra.*

> *Judgments affirmed; appellant to pay the costs.*