## JAMES M. WIMBERLY *v.* STATE OF MARYLAND

[No. 448, September Term, 1968.]

*Decided June 25, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Russell J. White* for appellant.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Samuel A. Green, Jr., State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was one of those arrested on 16 August

1968 in a private dwelling entered by the police under the authority of a search and seizure warrant issued on the basis of an affidavit alleging probable cause that the narcotic laws were being violated. See *Haley, et al. v. State,* 7 Md. App. 18. He was charged with various violations of the narcotic laws, jointly with seven other persons under indictment No. 34985 and individually under indictment No. 34984. He obtained a separate trial in the Circuit Court for Baltimore County, elected to be tried by the court and was convicted and sentenced on 3 January 1969 as follows:

> Indictment No. 34985—2nd count, unlawful control of a narcotic drug, marijuana; 2 years.
> Indictment No. 34984—3rd count, unlawful control of a dangerous drug, amphetamine; 6th count, unlawful control of a dangerous drug, barbiturate; general sentence of 2 years, the sentences to run concurrently.

The only question presented on appeal is as to the sufficiency of the evidence to sustain the convictions.

The testimony of Detective Raymond Donovan of the Baltimore County Police Department was that when the police forcibly entered the house by "the front and rear door simultaneously", there were "approximately twelve youngsters on the premises * * * Most of them were fleeing, trying to get out the back door. Others were running into the various rooms, bedrooms and bathrooms, as such." The appellant was first observed coming from the bathroom. The police took everyone into the living room and "nearly immediately thereafter" two officers, Grimes and Manzari, searched the bathroom. During the cross-examination of Donovan, in answer to a question by the court, he said that in the bathroom the police found "a vial of marijuana * * * smashed in the bathtub, as I recall, and a vial of methadone, dolophine tablets, also found in the bathroom, and in the commode were a few red capsules." He was asked by defense counsel: "Was there any evidence that Wimberly had possessed these particular

items of narcotics?" He replied: "No, he had nothing on his absolute possession, nothing on his person." Nor could he say that the appellant had any contact with the narcotics found in the bathroom.

Corporal Kenneth Grimes of the Baltimore County Police Department assisted in the search detail with Detective Manzari. He first saw the appellant in the living room. He testified as to what narcotics and narcotic paraphernalia were found in the premises and on the person of others searched. As to this evidence, when it was noted that the appellant was seen coming out of the bathroom, the court said: "Then confine it to the bathroom * * * We can't hold this man responsible for things which were physically out of his reach or control." As to the bathroom, Grimes testified that he and Manzari found "one broken vial containing suspected traces of marijuana" in the bathtub; "four white, round tablets * * * in the medicine cabinet, and in the flush bowl was several red capsules, partly dissolved that we didn't even remove." Objection, apparently directed to the testimony regarding the red capsules, was made and sustained. The witness said the white tablets, which when found in the medicine cabinet were wrapped in white tissue, were analyzed and found to contain "Methadone which is a synthetic prohibited narcotic." Grimes said nothing further about the smashed vial found in the bathtub which he had referred to as "containing suspected traces of marijuana" and which Donovan had characterized as "a vial of marijuana." On cross-examination of Grimes it was clearly brought out that the narcotics found in the living room were found on the person of individuals or under chairs where they were seated; that nothing was found on the person of the appellant or near his person; and that he had been taken into the living room by the police. He did not own the house or live on the premises. The court asked Grimes whether the narcotics found in the living room were "within his reasonable probable reach or control?" The officer replied, "I don't know how to answer that, really, for you other than to say that all of the nar-

cotics in that house were under his control." The State rested and motion for judgment of acquittal was denied.

The appellant testified in his own behalf. He was 19 years of age, lived with his mother and father and was a sophomore at the University of Missouri. He had never been in the house before and knew Carl Weiland, whose parents owned the house, only by sight; he had never been out with him. He went to the house on the night of the raid with several others when a Mike Corcoran (later charged as a juvenile) mentioned that there was a party there. He was there about 50 minutes before the police arrived. There was music playing and a girl mentioned she had some beer in the car and they went out and got it and sat on the floor drinking beer and talking. He denied having any narcotics in his possession or in his control and denied that he ever used narcotics; nor did he smoke. He did not notice any unusual odors and to his knowledge no one was smoking marijuana. Before the police arrived, a friend, Richard Marks, suggested he spend the night at his house, and he called his mother to ask if it was all right. He was going to leave right after the call to his mother who wanted him to bring the car home and discuss spending the night at his friend's home. He was in the process of leaving when the police entered. He was in the hall, was taken in the living room by the police and searched. He said he had not been in the bathroom. The appellant's father and mother testified. His mother and father verified that he had telephoned about 9:35 to 9:40 P.M. and the content of the conversation. The appellant had never been convicted of a crime or of a serious traffic offense and had never been in any kind of trouble. In rebuttal the State produced Detective Manzari who said he saw no beer on the premises.

In rendering its verdicts the court thought the appellant "knew he was headed for a marijuana party, a dope party. I think he went into it with his eyes open, and I cannot overlook the testimony of the police officers if you take either one of them * * * Take either of them, and

I believe them. The first officer testified he saw this young man coming out of the bathroom, and they found narcotics in the bathroom. The second one didn't see him come out of the bathroom. He was, by that time, in the living room, and the officer testified that he had within his reach and reasonable control—and that's all you need —narcotics under the definition as set forth in Article 27."

We think the court was clearly wrong in its judgment on the evidence. Md. Rule 1086. As to the evidence found in the bathroom, objection to the testimony with regard to the red capsules, observed in the toilet and never shown to be a narcotic drug, was sustained. With regard to the vial found smashed in the bathtub, the record does not show whether or not it was analyzed but in oral argument on appeal the State conceded that the vial and its contents had been analyzed with negative results. Thus the only drug proved to have been in the bathroom was methadone.[1] This evidence may not support the conviction of control of "cannabis Savita L, to wit: marijuana", defined as a narcotic drug by § 276(o) or the control of "amphetamine" or "barbiturate" proscribed by Code, Art. 27, § 313C(a). As to the drugs found on the person of others on the premises, we think it patent in the circumstances that they may not properly be found to have been in the control of the appellant. As to the drugs found on the premises other than in the bathroom, a diagram of the premises was received in evidence by stipulation. The diagram showed the location of the rooms of the house and certain furniture in the rooms. It indicated by item number where evidence was found. Item 3 was explained by the testimony of Grimes to be ten No. 25 hypodermic needles, three eyedroppers, light blue capsules "that were analyzed and found to be pentobarbital

---

1. According to Webster's Third New. International Dictionary (unabridged) methadone is a narcotic drug chemically identified as 6-dimethylamino-4, 4-diphenyl-3-heptanone. It appears to be within the definition of a narcotic drug set forth in Md. Code, Art. 27, § 276(o)(2) as a form of "amidone". Thus its possession and control is proscribed by § 277.

and amphetamine, and also some amobarbital" found in a dresser in a bedroom "used by the owner of the home, Carl Weiland." Item 5 was marijuana found in a cabinet located in the kitchen. Item 6 was a pipe with aluminum foil over the bowl found in the kitchen on the drain board of the sink. (There is no other evidence with regard to this item). It appears from the diagram that evidence, designated as item 7, was found in bunk beds in another bedroom, but there is no testimony as to what this evidence was. Thus, with respect to the evidence found on the premises as disclosed by the record, the only articles which could in any way support the convictions of the appellant were the marijuana found in the kitchen and the pentobarbital and amphetamine found in a dresser in Weiland's bedroom; the appellant was not convicted of possession of narcotic paraphernalia. We found in *Haley, et al. v. State, supra,* that in the circumstances disclosed by the record the drugs found on the premises would not support convictions of possession or control of those drugs in those persons not having a proprietary interest in the premises or living there. The appellant had the same status as the defendants in *Haley* arrested on the premises and we hold, for the reasons stated in *Haley,* that the evidence found in the bedroom and kitchen was not sufficient to support the charges of control of these drugs in the appellant. As to the living room, the diagram indicated that items Nos. 1, 2, 9, 10 and 11 were found therein. Grimes testified that item No. 1 was taken off the person of Stephen Haley who was seated on the sofa—a corncob pipe which contained traces of marijuana, one envelope and one vial containing marijuana. Item No. 2 was seized from the person of John Peterson —one black wooden pipe with aluminum foil over the bowl, a pack of cigarette paper, and some wires for cleaning the hypodermic needles. The record does not disclose where Peterson was sitting. There was no testimony as to what items Nos. 9, 10 and 11 were and exactly where they were found, whether on the person of one of those arrested or somewhere in the room. Thus there was no

evidence that any drugs were found in the living room other than on the person of Haley and Peterson who were themselves in that room. Grimes said when he noticed the appellant he was seated near the window in the living room, but we think it clear that he was taken into the living room by the police. Although Grimes, when asked by the court whether the appellant "was within reaching distance of any of these narcotics" indicated on the diagram as items being found in the living room, replied, "I would say yes, Your Honor," he later qualified his answer as hereinbefore stated. We cannot say that the testimony with respect to what was found in the living room showed directly or supported a rational inference that the appellant was in control of prohibited drugs as charged.

Since no prohibited drugs were found in the physical possession of the appellant, since the only drug proved to have been found in the bathroom did not support the allegations of the charges of which he was convicted, since we cannot say that the appellant was in control of the drugs found in the kitchen or bedroom or on the person of others arrested, and since there was no sufficient evidence of drugs being found in the living room other than on the person of others in the living room and since in any event the appellant had been taken into the living room by the police and seated by them by the picture window, the evidence, either considered in its totality or item by item, did not show directly nor did it support a rational inference of the facts to be proved, from which the court could fairly be convinced, beyond a reasonable doubt, of the guilt of the appellant of the offenses of which he was convicted. *Williams v. State,* 5 Md. App. 450. Therefore we must conclude that the judgment of the court on the evidence was clearly erroneous.

> *Judgments reversed; case remanded for a new trial; costs to be paid by the Baltimore County Council.*