552 A.2d 1351

**SUN KIN CHAN**

v.

**STATE of Maryland.**

**No. 754, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Feb. 7, 1989.

288

Deborah L. Moran (James J. Cromwell, John C. Monahan and Frank, Bernstein, Conaway & Goldman, on the brief) Bethesda, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty., for Montgomery County, Rockville, on the brief), for appellee.

Argued Before MOYLAN, BISHOP and JAMES S. GETTY, (Retired, Specially Assigned), JJ.

MOYLAN, Judge.

The appellant, Sun Kin Chan, was convicted in the Circuit Court for Montgomery County by Judge William M. Cave,

sitting without a jury, of 1) possession of cocaine with intent to distribute, 2) possession of drug paraphernalia, 3) illegal gambling, and 4) possession of a short-barrelled shotgun. Upon this appeal, he raises essentially two contentions:

1. That all of the evidence found in the search of 10500 Rockville Pike should have been suppressed because the warrant for that search was the tainted product of an unconstitutional and/or unlawful "trap and trace" placed upon his telephone; and

2. That the evidence was not legally sufficient to support the convictions.

In 1986, the Vice Intelligence Unit of the Montgomery County Police Department began an investigation into illicit bookmaking operations. After conducting a surveillance of 10500 Rockville Pike in December, 1986, the police obtained a court order for the installation of a pen register on telephone number 897–5875, registered to that address.

Pursuant to that order, they installed a "pen register," a mechanical device for recording the numbers dialed from that telephone, and a "trap and trace," a separate device which records the originating number of all incoming calls (whether completed or merely attempted). An additional feature of the investigative technique used was a "dialed number recorder," which records the duration of all calls, whether incoming or outgoing.

The statistical data compiled over the eighty-day period from February 20, 1987, through May 11, 1987, provided overwhelming evidence of a gambling operation. Over 5,000 calls were received or made, most of them during "prime time betting hours." Hundreds of outgoing calls were to half-a-dozen various "sports hotlines," providing up-to-the-minute data on every type of sporting event, including the current "betting line." Based upon that data, Judge Cave issued a search and seizure warrant for 10500 Rockville Pike. In executing that search warrant, the po-

lice recovered not only evidence of gambling but the drugs, drug paraphernalia, and shotgun as well.

Essentially conceding the legitimacy of the court order for the "pen register," the appellant argues strenuously that the "trap and trace" of the incoming calls went beyond the scope of the court order and was, therefore, in some fashion unconstitutional and/or unlawful. His argument is that the information thus unconstitutionally or unlawfully obtained thereby tainted both the search warrant based upon it and, *ipso facto*, the search executed pursuant to that warrant. He takes exclusion for granted.

## THE PROBLEM OF PINPOINTING THE ISSUE

It is initially difficult to come to grips with the appellant's argument because of its elusive, phantom quality. It meanders randomly in and out of the Fourth Amendment, the Federal Wiretapping Statute, the Maryland Wiretapping Statute, the Federal Pen Register Statute and the Maryland Pen Register Statute. When one of these proves in some respect unavailing, the argument shifts nimbly to another which, though availing in that one regard, may be unavailing in some other. The appellant never tells us precisely what law has been violated or in precisely what fashion. We are left with the impression of something bad lurking out there in the mists but that something is never cleanly identified. Countering the argument is like trying to pin down a cloud. The appellant presents us, as if through a kaleidoscope, with an amalgam created out of bits and pieces of various laws.

If the appellant blurs the arguable wrong done to him, his argument is even more diffuse with respect to the arguable remedy. He refers casually to *the* Exclusionary Rule as if such a monolithic phenomenon even exists. With the remedy as with the wrong, differentiation is called for.

There is, of course, no such thing as *the* Exclusionary Rule. There are many exclusionary rules, just as there are also many wrongs not redressed by the exclusion of evi-

dence. There are Federal exclusionary rules and state exclusionary rules. There are judicially created exclusionary rules and legislatively created exclusionary rules. There are constitutional exclusionary rules and statutory exclusionary rules. There are broad exclusionary rules and, as with the wiretapping statutes, highly particularized exclusionary rules available only for infractions of certain specified laws. There are exclusionary rules aimed only at governmental officials and exclusionary rules aimed at everybody. There are exclusionary rules applicable only in criminal trials upon the merits and exclusionary rules barring the use of evidence in any forum in any fashion.

Before invoking one of these exclusionary rules, the complaining party must first identify the wrong allegedly done to him and then determine which, if any, exclusionary rule has been specifically provided for the redress of that particular wrong. If Violation A has occurred, one may not resort to an exclusionary rule which has been provided only for Violation B.

In the case before us, there are five possible violations of the law that the appellant seems to claim. There are, therefore, five possibilities for redress in terms of one or another exclusionary rule or lack thereof.

| LAW VIOLATED | EXCLUSIONARY RULE |
|---|---|
| FOURTH AMENDMENT | MAPP v. OHIO |
| FEDERAL WIRETAP LAW | SEC. 2515<br>18 U.S.C. |
| MARYLAND WIRETAP LAW | SEC. 10-405<br>CTS. & JUD. PROC. ART. |
| FEDERAL PEN REGISTER LAW | NO EXCLUSIONARY RULE |
| MARYLAND PEN REGISTER LAW | NO EXCLUSIONARY RULE |

We turn our attention, one by one, to the possible constitutional provisions or statutes that may have been violated. If any such violation is found to have occurred, we will consider which, if any, exclusionary rule may have been created to deal with such a violation.

## THE FOURTH AMENDMENT NOT INVOLVED

In the context of intercepted telephone communications, the expectation of privacy contemplated by the Fourth Amendment goes only to the content of the communication and not to the fact that the communication took place. In defining the limits of Fourth Amendment protection, Maryland anticipated the Supreme Court. In *Smith v. State*, 283 Md. 156, 389 A.2d 858 (1978), Chief Judge Murphy spoke for the majority of the Court of Appeals in holding that pen register surveillance does not come within the ambit of the Fourth Amendment. He pointed out, at 283 Md. 167–168, 389 A.2d 858, "It is generally held that the expectation of privacy protected by the fourth amendment attaches to the content of a telephone conversation and not to the fact that a conversation took place."

■ After analyzing numerous state and Federal cases and academic authorities, Judge Murphy pointed out that there is no remaining expectation of privacy in a fact that is necessarily revealed to the telephone company in order for a call to be completed. Although *Smith v. State, supra,* dealt literally with a "pen register," its rationale would apply with equal validity to a "trap and trace." Regardless of the direction of the telephone call, whether outgoing or incoming, the dialer has of necessity revealed to the telephone company the number to be dialed. The Court of Appeals rationale distinguishes only between the content of a call and the fact of a call. The inapplicability of the Fourth Amendment is bi-directional:

> "While the content of a call is not revealed to the telephone company, the information as to the number dialed must necessarily be revealed, since it is through telephone company switching equipment that calls are completed. As a recipient of such information, the company may reveal it since the caller can have no reasonable expectation that it will remain private. In fact, the caller should have even less of a justified expectation of privacy, since unlike the disclosures in [*United States v.*] *White* [401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971)] and [*United States v.*] *Miller* [425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976)] the use of a pen register does not reveal the contents of a communication."

283 Md. at 172, 389 A.2d 858. The holding of the Court of Appeals clearly did not depend upon the direction of the telephone call being traced:

> "We hold that there is no constitutionally protected reasonable expectation of privacy in the numbers dialed into a telephone system and hence no search within the fourth amendment is implicated by the use of a pen register installed at the central offices of the telephone company. While the guarantees of the fourth amendment are broad, they are not boundless ...; not everything a person may want to be private is protected by the fourth amendment. As *Katz* [*v. United States,* 389 U.S.

347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)] teaches, the fourth amendment does not afford our citizens 'a general constitutional right to privacy.'" (Citation omitted). 283 Md. at 173–174, 389 A.2d 858.

In *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the Supreme Court affirmed the decision of the Court of Appeals. It is clear from its rationale that a "trap and trace" device no more implicates Fourth Amendment concerns than did the "pen register" device that was literally before the Court. The fact that, as in this case, the investigative technique could reveal that the call was consummated rather than simply attempted does not alter the analysis. The critical distinction, for Fourth Amendment purposes, is between the fact of a communication and the contents of that communication. Justice Blackmun, writing for the majority, pointed out, "[A] pen register differs significantly from the listening device employed in *Katz*, for pen registers do not acquire the *contents* of communications." (Emphasis in original). 442 U.S. at 741, 99 S.Ct. at 2581. Neither does a "trap and trace." Nor, for that matter, does a "dialed number recorder."

Justice Blackmun initially pointed out that the place of installation did not involve an intrusion into a constitutionally protected area. That, of course, would be true whether the electronic observer, from the safe base of the telephone company office, was looking up the line or down the line:

> "Since the pen register was installed on telephone company property at the telephone company's central offices, petitioner obviously cannot claim that his 'property' was invaded or that police intruded into a 'constitutionally protected area.'"

442 U.S. at 741, 99 S.Ct. at 2581.

Having found that there was no intrusion into a constitutionally protected area, the Supreme Court moved on to analyze whether there was any reasonable expectation of privacy in a more general sense. Answering that question

in the negative, the Court reasoned that the dialing process itself necessitates revealing to a third party (the telephone company) the wish to place a particular call. Once the telephone company is brought into the picture, privacy has been irrevocably breached. Once again, the rationale would not depend upon whether the call was outgoing or incoming:

"All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed. All subscribers realize, moreover, that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills. In fact, pen registers and similar devices are routinely used by telephone companies 'for the purposes of checking billing operations, detecting fraud, and preventing violations of law.'"

442 U.S. at 742, 99 S.Ct. at 2581.

In a helpful analogy, Justice Blackmun pointed out that in the simpler world of yesteryear, telephone calls could be completed only through the personal intervention of a live operator. That live operator, under no constitutional inhibition, was unquestionably competent to testify that a call had been placed from one number to another and that the call had been completed. Both the source of the call and its destination alike would have been fair game. Although the operator would not have been privileged, absent exceptions not here pertinent, to eavesdrop upon the contents of a completed call, the operator would of necessity have been a knowledgeable participant in, and witness to, the placement of that call and the fact of its completion. The fact that the necessary intermediary is now a computer instead of a live operator does not alter the doctrinal analysis:

"The switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber. Petitioner concedes that if he had placed his calls through an operator, he could claim no legitimate

expectation of privacy: We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate."

442 U.S. at 744–745, 99 S.Ct. at 2582.

If the telephone company keeps a record of its calls, as is generally the case with long-distance calls but could be the case with even local calls, such records would be subject to legitimate subpoena at the trial either of the caller or of the person called. The billing, moreover, deals only with calls that have actually been completed. The amount of the bill frequently depends, in turn, upon the duration of the call. With respect to the dialing process in either direction, the possibility of the call's being recorded is controlling in terms of removing that process from the protective pale of the Fourth Amendment:

> "The fortuity of whether or not the phone company in fact elects to make a quasi-permanent record of a particular number dialed does not, in our view, make any constitutional difference. Regardless of the phone company's election, petitioner voluntarily conveyed to it information that it had facilities for recording and that it was free to record. In these circumstances, petitioner assumed the risk that the information would be divulged to police. Under petitioner's theory, Fourth Amendment protection would exist, or not, depending on how the telephone company chose to define local-dialing zones, and depending on how it chose to bill its customers for local calls. Calls placed across town, or dialed directly, would be protected; calls placed across the river, or dialed with operator assistance, might not be. We are not inclined to make a crazy quilt of the Fourth Amendment, especially in circumstances where (as here) the pattern of protection would be dictated by billing practices of a private corporation."

442 U.S. at 745, 99 S.Ct. at 2583.

If A has no expectation of privacy in the fact that he dialed B, then B by definition has no expectation of privacy in the fact that he was dialed by A. There is no constitu-

tional distinction between the questions of 1) whom you call
and 2) who calls you.

■ We hold that the Fourth Amendment was not in-
volved in this case. What follows ineluctably therefrom is
that neither was the exclusionary rule of *Mapp v. Ohio*, 367
U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *Mapp's*
exclusionary rule, of course, is imposed upon the states only
to implement the Federal Constitution and is indisputably
not available as a sanction for infractions of Federal statu-
tory law, state statutory law, local rule of court, etc.

### TITLE III NOT INVOLVED

■ Even without the benefit of the Fourth Amendment,
the appellant could, and does, rely upon Title III of the
Omnibus Crime Control and Safe Streets Act of 1968,
codified as 18 U.S.C. §§ 2510–2521. The fact that the
exclusionary rule of *Mapp v. Ohio* would not be available to
him for a violation of Federal statutory law as opposed to a
violation of the Federal Constitution would not be fatal to
his cause. Title III, in § 2515, provides its own built-in
exclusionary rule.

From the point of view of a defendant, moreover, it is an
exclusionary rule infinitely to be preferred to the relatively
skimpy exclusionary rule of *Mapp*. It applies, unlike
*Mapp*, to civil and criminal cases alike. It applies, unlike
*Mapp*, to the grand jury stage as well as the trial stage. It
applies, unlike *Mapp*, to private persons as well as to
agents of government. Since the compass of the statutory
exclusionary rule is far more sweeping than that of *Mapp*
and since its purpose is not limited to the narrow prophylac-
tic mission of "policing the police," the statutory exclusion-
ary rule would seem, unlike *Mapp*, to be invulnerable to the
"good faith" exception.

We must turn, therefore, to the question of whether the
investigative technique used in this case was one regulated

by Title III. We hold that it was not. *United States v. New York Telephone Company*, 434 U.S. 159, 166, 98 S.Ct. 364, 369, 54 L.Ed.2d 376, 385 (1977) stated flatly, "Both the language of the statute and its legislative history establish beyond any doubt that pen registers are not governed by Title III." By a compelling parity of reasoning, the same would be true of a "trap and trace" and of a "dialed number recorder." Looking to the statutory definitions of "intercept," "contents," and "communication," the Supreme Court concluded that the clear purpose of Title III was to protect the intrinsic subject matter of a communication and not the extrinsic fact that a communication took place. The protection is of the message, not the medium.

"Title III is concerned only with orders 'authorizing or approving the *interception* of a wire or oral communication....' ... Congress defined 'intercept' to mean 'the *aural* acquisition of the *contents* of any wire or oral *communication* through the use of any electronic, mechanical, or other device.'... Pen registers do not 'intercept' because they do not acquire the 'contents' of communications, as that term is defined by 18 U.S.C. § 2510(8).... These devices do not hear sound. They disclose only the telephone numbers that have been dialed —a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed [1] is disclosed by pen registers. Furthermore, pen registers do not accomplish the 'aural acquisition' of anything. They decode outgoing telephone numbers by responding to changes in electrical voltage caused by the turning of the telephone dial (or the pressing of buttons on push button telephones) and present the information in a form to be interpreted by sight rather

---

1. This factor, though true as to the pen register before the Supreme Court, is not true with respect to a "dialed number recorder." The existence of this factor, however, was clearly not critical to the Supreme Court's holding.

than by hearing." (Emphasis in original) (Footnotes omitted).

434 U.S. at 166–167, 98 S.Ct. at 369–370.

Indeed, the Supreme Court seemed to treat the pen register simply as a particular instance of permissible "tracing" generally, as it quoted with approval from the legislative history of Title III and the expressed intent of the legislation contained in the Senate Report:

> "The proposed legislation is not designed to prevent the tracing of phone calls. The use of a 'pen register,' *for example*, would be permissible.... The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication." (Citation omitted) (Emphasis supplied).

434 U.S. at 167–168, 98 S.Ct. at 370. The Congress that wrote the law limited the prohibition to the "interception of oral communications."

> "It is clear that Congress did not view pen registers as posing a threat to privacy of the same dimension as the interception of oral communications and did not intend to impose Title III restrictions upon their use."

434 U.S. at 168, 98 S.Ct. at 370.

## CHAPTER 206 NOT INVOLVED

■ Eighteen years after the passage of Title III, Congress decided for the first time to regulate the use of both the "pen register" and the "trap and trace." Because, as we have discussed, the earlier law provided no such regulation, a totally new law was necessary. By the Electronic Communications Privacy Act of 1986, Congress enacted a new Chapter 206 dealing with the subject of "Pen Registers and Trap and Trace Devices," now codified as 18 U.S.C. §§ 3121–3126. It was not a supplement to the preexisting Chapter 119 dealing with the distinct subject matter of "Wire Interception and Interception of Oral Communications," codified as §§ 2510–2521. It was a separate law covering a separate subject matter.

Although it treated the two devices in precisely the same way, the new law recognized the mechanical difference between a "pen register" and a "trap and trace." Sections 3126(3) and (4), in pertinent part, defined the two terms:

"(3) the term 'pen register' means a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached ...;

(4) the term 'trap and trace device' means a device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted".

Now regulating the "pen register" and "trap and trace" generally, the new law did not even take notice of the sub-issue of whether either such device would reveal whether a call was actually completed rather than merely attempted.

The law provided that after its effective date, "no person may install or use a pen register or a trap and trace device without first obtaining a court order" in compliance with various procedural requirements. The "pen register" used on the telephone of the appellant in this case would have passed muster under the new Federal statute, if it had been applicable. Since the "trap and trace," on the other hand, was installed without benefit of court order, it obviously would not have passed muster, had the new Federal law been applicable.

The new law took effect on January 20, 1987, ninety days after its enactment, and Federal law enforcement agents had to comply with it as of that date. There was a grace period provided, however, before state law enforcement officials would be required to comply. Subsection (b) of the new law provided:

"(b) *Special Rule for State Authorization of Interceptions.*—Any pen register or trap and trace device order or installation which would be valid and lawful without regard to the amendments made by this title shall be

valid and lawful notwithstanding such amendments if such order or installation occurs during the period beginning on the date such amendments take effect and ending on the earlier of—

(1) The day before the date of the taking effect of changes in State law required in order to make orders or installations under federal law as amended by this title; or

(2) The date two years after the date of the enactment of this act."

Electronic Communications Privacy Act, Pub.L. No. 99–508, § 302, 100 Stat. 1848, 1872 (1986).

As we shall discuss hereinafter, neither a "pen register" nor a "trap and trace" was prohibited in Maryland prior to the enactment of the new Federal statute. Absent any prohibition, they were, therefore, "valid and lawful" prior to the enactment of the new Federal statute. The grace period provided that they would continue to be valid and lawful until the earlier of October 21, 1988 (two years after the enactment of the new Federal law) or June 30, 1988 (the day before the new Maryland regulation, designed to bring us into conformity with the new Federal statute, became effective).

The authorization for the installation of the "pen register" in this case was made on February 6, 1987, and the authorization for the extension was made on April 10, 1987. The installation of both the "pen register" and the "trap and trace" took place within the grace period. Though apparently not required by the law, the full utilization of the devices was coincidentally completed before the grace period came to an end.

By its explicit terms, therefore, the new Federal law regulating the "pen register" and the "trap and trace" was not applicable to the employment by the Montgomery County police of those devices in this case.

## MARYLAND WIRETAPPING STATUTE
## NOT INVOLVED

■ Even without the benefit of either the Fourth Amendment or the Federal Title III, the appellant could, and does, rely upon the Maryland Wiretapping and Electronic Surveillance Statute. Even as in the case of Title III, the fact that the exclusionary rule of *Mapp v. Ohio* would not be available to him for a violation of Maryland statutory law as opposed to a violation of the Federal Constitution would not be fatal to his cause. The Maryland Wiretapping and Electronic Surveillance Statute, in § 10–405 of Cts. & Jud.Proc.Article, provides its own built-in exclusionary rule.

■ From the point of view of a defendant, moreover, it is, just as in the case of its Federal statutory counterpart, an exclusionary rule infinitely to be preferred to the relatively skimpy exclusionary rule of *Mapp*. It totally prohibits, for instance, the use of illegally obtained communications as either substantive or impeachment evidence, *Wood v. State*, 290 Md. 579, 431 A.2d 93 (1981), unlike the exclusionary rule of *Mapp*, which does not apply to impeachment evidence. *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559, *reh'g denied*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980). It would mandate, for instance, the dismissal of a grand jury indictment following disclosure to the grand jury of illegally intercepted communications, *State v. Mayes*, 39 Md.App. 635, 387 A.2d 794 (1978), *aff'd* 284 Md. 625, 399 A.2d 597 (1979), unlike *Mapp*'s exclusionary rule, which does not extend to the grand jury. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Once again, as with its Federal counterpart, the compass of this Maryland statutory exclusionary rule is far more sweeping than that of *Mapp*. Once again, since its purpose is not limited to the narrow prophylactic mission of "policing the police," the statutory exclusionary rule would seem, unlike *Mapp*, invulnerable to the "good faith" exception.

We must turn, therefore, to the question of whether the investigative technique used in this case was one regulated by the Maryland Wiretapping Statute. We hold that it was not. The Maryland statute dealing with wiretapping and electronic surveillance significantly parallels its Federal counterpart. The Maryland version of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 was our Wiretapping and Electronic Surveillance Act of 1977. It is now codified in Cts. & Jud.Proc. Art. Subtitle 4, "Wiretapping and Electronic Surveillance," §§ 10–401 through 10–414. *See generally*, Gilbert, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law*, 8 U.Balt.L.Rev. 183 (1979).

Just as with the Federal wiretapping law, the "pen register" and its kindred devices are not covered by the Maryland wiretapping statute. As Chief Judge Murphy pointed out for the Court of Appeals in *Smith v. State*, 283 Md. 156, 163–164, 389 A.2d 858 (1978):

"Although the verbiage of § 10–402(a) differs from the federal statute, the prohibitions underlying each law require the 'interception' of a communication. We conclude, as did the Supreme Court in [*United States v.*] *New York Telephone*, [434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)] and most federal courts which have considered the question, that a pen register is not a device which 'intercepts' a telephonic communication. Accordingly, the use of the pen register did not violate § 10–402(a)." (Footnote omitted).

Just as with the "pen register," neither the "trap and trace" nor the "dialed number recorder" *intercept* a *communication* as those terms of art are used in the essentially parallel Federal and Maryland wiretapping statutes.

If it were otherwise, neither the Federal Congress nor the Maryland General Assembly would have found it necessary to enact new and separate legislative provisions when they decided, 18 years later in the case of one legislature and 11 years later in the case of the other, to regulate for the first

time the use of the "pen register" and the "trap and trace" devices.

## MARYLAND "PEN REGISTER" STATUTE NOT INVOLVED

◼︎ In response to the Electronic Communications Privacy Act of 1986 passed by the Federal Congress, the Maryland General Assembly moved for the first time to regulate "pen registers" and "trap and trace" devices by Chapter 607 of the Acts of 1988. The new regulation is not part of the "Wiretapping and Electronic Surveillance" subtitle but is a separate subtitle of its own, 4B, dealing with the distinct subject matter of "Pen Registers and Trap and Trace Devices." Its provisions and its wording are virtually verbatim with those of its Federal counterpart.

To the extent to which the investigative nuance of determining that a call has been completed rather than simply attempted, in the case of outgoing and incoming calls alike, is a matter deserving of special legislative regulation, the simple fact is that the Maryland General Assembly, just as the Federal Congress, has never passed any such regulation. It is not the case that that which has not been permitted is thereby prohibited. It is rather the case, at least in governmental schemes committed to human freedom, that that which has not been prohibited is thereby permitted. That is true with respect to investigative conduct just as surely as it is true with respect to conduct investigated.

In terms of subject matter, the new Maryland statute unquestionably covers the types of "pen register" and "trap and trace" devices used in this case. With respect to the application for and the issuance of the court order for the "pen register" in this case, they would, coincidentally, have satisfied the provisions of the new statute, had the new statute been applicable to them. With respect to the installation of the "trap and trace" device, without benefit of court order, that installation, coincidentally, would have run

afoul of the new statute, had the new statute been applicable to it.

The new Maryland Pen Register Statute was not, however, applicable to the "pen register" or "trap and trace" devices used by the Montgomery County police in this case. The critical dates here are February 6 and April 10, 1987. The new Maryland statute did not take effect until July 1, 1988, well over one year later. The investigative techniques used by the Montgomery County police against the appellant were simply unregulated in any fashion, by Federal or state law, at the time of such use. The police could not violate a nonexistent statute.

The appellant doggedly persists that even if the new regulatory statutes, Federal and state, were not applicable at the time the police gathered their probable cause in this case, the police nonetheless acted unlawfully in that the installation of a "trap and trace" device exceeded the scope of the court order authorizing the "pen register." In making this argument, the appellant stubbornly refuses to see the clear implications of an investigative technique's being totally unregulated.

The police were not even required to apply for a court order to install the "pen register" itself. It was a totally gratuitous and unnecessary precaution on their part. The use of the "pen register" here would have been beyond challenge even without benefit of court order. The court order itself being immaterial, compliance with its ostensible terms was equally immaterial. Had the use of the "pen register" exceeded the 60 days initially authorized, even absent an extension order, that would have been immaterial. Had the "pen register" been placed on a different telephone than that specified in the order, that also would have been immaterial.

The gratuitous action of the Montgomery County police and the gratuitous action of the Montgomery County court in seeking to satisfy a non-existent regulation did not, *ipso*

*facto*, create such regulation where the Legislature had provided none.

The order itself being meaningless, operating beyond its scope was equally meaningless.

## EVEN HAD THERE BEEN A VIOLATION, EXCLU-SION OF EVIDENCE IS NOT THE REMEDY

The appellant is twice bereft. Not only was there no violation of any regulatory statute, but there was no exclusionary rule available to the appellant even if there had been such a violation.

The Fourth Amendment, the Federal Wiretapping Statute, and the Maryland Wiretapping Statute, as we have discussed, all have their own, particular exclusionary rules. The subject matter of those respective protections, however, does not remotely embrace the "trap and trace" device at issue in this case. Both the Federal Pen Register Statute and the Maryland Pen Register Statute, on the other hand, do embrace the use of a "trap and trace" device. They are only unavailing to the appellant because the use of that device against him came before the new statutes went into effect.

Even if this time factor did not foreclose the appellant's resort to the Federal and state pen register statutes, however, they would still be of no help to him in this case. Each of them contains an explicit sanction or penalty for its violation and neither sanction is an exclusionary rule of evidence.

18 U.S.C. 3121(c) provides explicitly:

"Whoever knowingly violates subsection (a) shall be fined under this title or imprisoned not more than one year, or both."

That is the sum total of available sanctions for violating the Federal statute. Unlike the explicit legislative provision for a violation of the Federal Wiretapping Statute, no provision has been made by this statute for the exclusion of evidence.

Maryland is equally specific in providing a penalty for a violation of its new pen register statute. Cts. & Jud.Proc. Art. § 10–4B–02(c) provides:

> "A person who violates subsection (a) of this section, upon conviction, is subject to a fine not exceeding $5,000 or imprisonment not exceeding 1 year, or both."

That is the sum total of available sanctions for violating the Maryland statute. Unlike the explicit legislative provision for a violation of the Maryland Wiretapping Statute, no provision has been made by this statute for the exclusion of evidence.

 Under the circumstances, even if the results of an illegally installed "trap and trace" device were being offered directly into evidence at the trial itself on the merits of guilt or innocence, that evidence would be received. *A fortiori*, it will be received in an *ex parte* warrant application on the merely ancillary issue of probable cause. If even the direct use of illegally obtained evidence is not forbidden, *a fortiori*, a mere indirect or derivative use is not forbidden.

 One may not wish an exclusionary rule into being by waving a magic wand. It is something that must be deliberately and explicitly created to cover a given type of violation. None has ever been created to handle violations of pen register statutes, either at the Federal or state level. Therefore, none exists.

## EVEN AN EXPURGATED WARRANT APPLICATION WOULD STILL ESTABLISH PROBABLE CAUSE

 The appellant is actually thrice bereft. Even if the Federal Pen Register Statute or the Maryland Pen Register Statute or both had been applicable at the time the police installed the "trap and trace" device in this case and even if an exclusionary rule of evidence had been provided for such a violation, the search and seizure warrant at issue here would still not have been invalidated.

An exclusionary rule, where applicable, is a direction to a trial court not to receive certain types of improperly obtained evidence. At the appellate level, we deal with situations where such exclusionary directions erroneously have not been followed. It then becomes the job of the appellate court to determine whether such error resulted in sufficient prejudice to mandate reversal.

If unconstitutionally seized evidence, for instance, has been erroneously received at the trial on the merits, prejudice is presumed. The State will be able to avoid reversal only by satisfying the appellate court beyond a reasonable doubt that the error was harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh'g denied,* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967). The presumption of prejudice and the requirement of strong persuasion to the contrary is, of course, a sensitivity to the jury trial and the inability to know with any real degree of sureness what contaminating effect the improper evidence may have had on the jury's decision. Largely for reasons of symmetry and ease of administration, we apply the same harmless error standard to court trials.

█ Where evidence which should have been excluded was not excluded, on the other hand, in the very different context of a warrant application, we do not presume prejudice so lightly nor is there any reason to do so. We are dealing with decisions made by judges and not by juries. We are dealing with decisions, moreover, where we can make our own independent appraisal of probable cause. Under these more antiseptic conditions, the appellate court simply excises the contaminated information that should have been, but was not, excised earlier. The appellate court then determines for itself whether the remaining information was enough to establish probable cause. If it was, the erroneously received information was mere surplusage and its erroneous reception made no difference. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Mills v. State,* 278 Md. 262, 274, 363 A.2d 491 (1976).

Even giving the appellant the benefit of this standard of review generally available only for violations of constitutional dimension, the unchallenged and unchallengeable information in the search warrant application was itself enough to establish probable cause. The "trap and trace" results were surplusage.

After factoring out all information obtained from the use of the "trap and trace" device and looking only at that information obtained from the "pen register," one would have to be naive to the point of imbecility not to conclude that a gambling operation was taking place at 10500 Rockville Pike. The police affiant initially recited his seven-and-a-half years of experience in investigating gambling operations. After describing bookmaking operations in general, he pointed out that "it is common practice for a bookmaker to call his line service to get the Las Vegas lines on various sporting contests before betting hours."

The "pen register" revealed that during the eighty-day period of its use, 2,392 outgoing calls were made from the appellant's telephone, over sixty per cent of them during "prime time betting hours." During the peak hours for getting the latest Las Vegas line, moreover, 45 calls were made to George Michael's Sports Machine, providing precisely the type of information that a bookmaker would need to know. Twenty-eight calls were made to USA Today Hotline, a service providing similar information. One hundred nine calls were made to Sports Folio, a similar line service in Boston. Three hundred fifteen calls were made to the Washington Sports Line and 144 calls to Dial Sports by ESPN. The affiant offered to the judge his expert opinion that seventy-four per cent of the calls "were gambling related."

An interesting instance of the value of negative knowledge was provided by the fact that between April 19, the last day of the National Basketball Association season, and April 23, the beginning of the playoffs, there was little or no telephonic activity on the appellant's line. The police affiant gave his opinion that, "this pattern, of very little

activity on nights or days when there are no professional basketball games scheduled, has continued throughout the playoffs."

During one thirty-day period in April and early May, 113 calls, "just prior to, during, or immediately after gambling hours," were made to two telephone lines listed to one Lawrence Mars in Silver Spring. Subsequent surveillance of the Silver Spring address showed an unmistakable probability that gambling activity was also going on from the telephone at that address.

The conclusion of Judge William C. Miller, who denied the appellant's motion to suppress, speaks for us as well:

"Applying the more-likely-than-not common sense test to the pen register data, the issuing magistrate could logically conclude that teenagers do not make 64 telephone calls per day (they might keep the phone lines busy all night, but generally with only three or four calls) and it is more reasonable to conclude that 64 calls per day suggest some sort of a business enterprise. It is, of course, possible, as suggested by the defendants, that the 45 calls to George Michael's Sports Machine, the 28 calls to U.S.A. Today Hot Line, the 109 calls to Sports Folio, the 337 calls to Washington Sports Line and the 146 calls to Dial Sports by ESPN were placed during the 80–day period by fanatical sports fans since we do not know how many calls were actually completed. Our common sense and everyday experience, however, tells us that more likely than not a fanatical sports fan does not make 64 phone calls a day (this is inconsistent with such a fan being glued to ESPN, HTS and other televised sporting events). It is more reasonable to conclude that the frequency of calls indicates a business venture, and from the calls to telephone numbers that provide sports scores, scheduled games and sports line information that this business is somehow related to sporting events. It would not seem illogical for the issuing magistrate to conclude that a business enterprise conducted over the phone

which deals with the results of sporting events was more likely than not a bookmaking operation."

Even assuming that the "trap and trace" violated some hypothesized statute and even assuming that such a violation called for exclusion from consideration of the results of the "trap and trace," the "pen register" results alone were indisputably enough to establish probable cause for the issuance of the search warrant in this case. The fruits of the search conducted pursuant to that warrant were properly not suppressed.

## LEGAL SUFFICIENCY OF THE EVIDENCE

Our attention turns finally to the legal significance of the fruits of that search. Both the appellant and the State repair to *Folk v. State*, 11 Md.App. 508, 275 A.2d 184 (1971), as the controlling standard. We are not certain, however, that resort to *Folk* is even necessary under the facts of this case.

Synthesizing the existing case law, *Folk* catalogued a number of inculpating factors and a number of exculpating factors for cases involving "joint possession and joint control in several persons." 11 Md.App. at 511, 275 A.2d 184. The entire *Folk* analysis operated at a plateau of difficulty not even reached by the facts of this case. *Folk* was concerned with determining the criminal responsibility of mere visitors upon a premises or mere passengers in an automobile in which contraband was found. *Folk* sought to establish criteria for selecting one or two or three guilty possessors from a wider field of possible candidates. Quintessentially, *Folk* dealt with the problem of picking culprits out of a crowd. There was no crowd in this case.

Basically, the *Folk* criteria take on significance when the police have raided a house, find poker chips upon the table and money in the pot, and are confronted by five houseguests, each claiming to be the most naive of bystanders. The linkage is even more attenuated with respect to the sixth houseguest, who at the time of the raid is at the kitchen sink or in the bathroom. It is in such a context that

factors such as 1) the proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, and 3) the reasonable inference that the defendant was participating in the mutual use and enjoyment of the contraband, take on significance. These factors are without that same significance in the case of the owner or occupant of a premises, who may well be deemed responsible for contraband found upon his premises even if he is sound asleep in another room at the time of the raid or, for that matter, off at the drugstore or at the movies when the raiding party arrives.

In *Folk* itself, it must be remembered, we were dealing with establishing the guilt of a defendant who was but one of six passengers in a parked automobile in which a single marijuana cigarette was apparently burning. In those circumstances, the peripheral factors were essential to proof of "joint possession." Had the defendant been in control of the automobile, however, or had the crowd been smaller, the more far-flung indicia of guilt would have been less necessary.

In the cases analyzed by *Folk* where the evidence was held to have been not sufficient to establish joint possession, the defendants were generally mere guests and were frequently but part of a larger crowd. In *Haley v. State*, 7 Md.App. 18, 253 A.2d 424 (1969), the marijuana was found 1) in a dresser in a bedroom under some clothing, 2) under a mattress in another bedroom, and 3) in a closet in the kitchen. The three defendants were all arrested in the living room. Significant in that case was that "none of them had any proprietary interest in the premises or lived there." 11 Md.App. at 512, 275 A.2d 184. There is no remote suggestion that the occupant of that premises, on the other hand, could not have been held responsible for possession of the contraband secreted away in those hidden recesses.

In *Wimberly v. State*, 7 Md.App. 302, 254 A.2d 711 (1969), the defendant was held to be not responsible for contraband

found in the kitchen, in the bathroom, and in the bedroom of a house "in which Wimberly had no proprietary interest." 11 Md.App. at 513, 275 A.2d 184. Wimberly was not simply a mere guest but was, furthermore, but "one of approximately twelve youths found in the house." *Id.* The final case analyzed where the evidence was found not legally sufficient to establish joint possession was *Scott v. State,* 7 Md.App. 505, 256 A.2d 384 (1969). In that case, the only contraband found was in a pocketbook belonging to the defendant's sister and the pocketbook, moreover, was found in a part of the premises occupied exclusively by that sister.

In the case at bar, there was no crowd. One would not have expected a crowd. Unlike a betting parlor, a telephonic bookmaking operation is not a gregarious activity. Bettors do not come to place their wagers in person. They call in by telephone. One only expects to find at the vortex of the web, the persons running the operation, to wit, taking the bets.

When the searching party arrived at 10500 Rockville Pike, Apartment M–11, they found only two persons, one male and one female, in the two-bedroom apartment. The male was the appellant. The female was Fei Fei Yang. Both the room configuration and the contents of 10500 Rockville Pike, Apartment M–11, strongly suggested that the apartment was occupied by one male and one female. In one bedroom, men's clothing was found; in the other, women's clothing was found. This was, we hold, legally sufficient to support the inference that the appellant and Fei Fei Yang were the residents of 10500 Rockville Pike, Apartment M–11.

The case against the appellant in this regard, moreover, was even stronger. On the dining room table was a piece of mail addressed to "Mr. Sonny Chan" at 10500 Rockville Pike, Apartment M–11. We think the inference drawn by Judge Cave that the proper name "Sun" may well yield the nickname "Sonny" was a permitted one. In *Nutt v. State,* 16 Md.App. 695, 704, 299 A.2d 468 (1973), a letter

addressed to a defendant was a significant factor in proving that the defendant, found at that address, resided at that address. In *Wink v. State,* 76 Md.App. 677, 684–685, 547 A.2d 1122 (1988), a telephone bill addressed to the defendant at the premises where contraband was found, coupled with the defendant's presence at the time of the search, was enough to support the inference that the defendant had a possessory interest in the premises.

The appellant's effort to distinguish *Wink v. State* misses the mark. *Wink* does point out, to be sure, that there is a different burden of ultimate persuasion in a probation revocation hearing than there is in a criminal trial. That, however, has nothing to do with *Wink*'s applicability to this case. There is no difference with respect to the very different burden of production. It is only the burden of production, of course, that we are dealing with when we assess the legal sufficiency of the evidence.

A defendant, of course, has no obligation to prove his innocence. Once the State has mounted a *prima facie* case against him, however, the failure to counter or to rebut that *prima facie* case may nonetheless be a failure the defendant suffers at his own tactical peril. If someone other than the appellant had been the lawful occupant of 10500 Rockville Pike, Apartment M–11, it is inconceivable that no evidence to that effect was forthcoming. If the appellant had never borne the nickname "Sonny"; if Sun Kin Chan and Sonny Chan were two different persons, it is inconceivable that no evidence to that effect was forthcoming. If the appellant had been a mere guest in 10500 Rockville Pike, unlucky enough to have been present at the moment the raiding party arrived, it is inconceivable that there was no testimony to that effect.

 Once it has been established that the evidence is legally sufficient to permit the inference that the appellant had a possessory interest in 10500 Rockville Pike, Apartment M–11, it follows therefrom that the evidence is legally sufficient to find that he was in constructive possession of

contraband found anywhere in that apartment. *Nutt v. State, supra,* 16 Md.App. at 704–707, 299 A.2d 468; *Gipe v. State,* 55 Md.App. 604, 615–616, 466 A.2d 40 (1983); *Armwood v. State,* 229 Md. 565, 570–571, 185 A.2d 357 (1962); *Henson v. State,* 236 Md. 518, 525, 204 A.2d 516 (1964). Precisely on point is Judge Robert Bell's conclusion for this Court in *Wink v. State, supra,* at 76 Md.App. 684–685, 547 A.2d 1122:

> "Appellant was present on the premises when the search warrant was executed. As we have already noted, one of the items seized was a telephone bill addressed to appellant at those premises. We think that evidence sufficient to support an inference that appellant had a possessory interest in the premises. That, in turn, is sufficient to support the further inference that he, at least constructively, possessed the 'controlled paraphernalia' found on the premises. *See Folk v. State,* 11 Md.App. 508, 518, 275 A.2d 184 (1971)."

In terms of the gambling conviction, ten telephones were found in this small, two-bedroom apartment. "Two or three" of them were on the dining room table, which seems to have been the beehive of activity. On that same dining room table was found the letter addressed to "Mr. Sonny Chan." On that same dining room table was a notebook, which an FBI report, introduced into evidence by stipulation, indicated was a gambling-related ledger. The $1,800 in cash taken from the appellant's person was, moreover, compatible with a bookmaking operation.

In terms of the possession of the short-barrelled shotgun, a short-barrelled shotgun and a shell were found in the hall closet. There was also found in the apartment a receipt from Gilbert Guns, recording the purchase of two handguns by a "Thomas Chan."

In terms of the possession of cocaine with intent to distribute charge, a paper bag containing 94.34 grams of cocaine was found in the closet of the "male" bedroom. There was found in a kitchen drawer a sifter with cocaine

residue. There was found in the hall closet a beeper. There was found in the hall closet, scales and a strainer. There was found in a kitchen cabinet, an envelope enclosing a glassine baggie containing cocaine. The $1,800 in cash found on the appellant's person would also be compatible with a narcotics distribution operation.

On all counts, the evidence to support the convictions was abundant.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.